**HARTFORD–EMPIRE CO. v. OBEAR–NESTER GLASS CO.**

**OBEAR–NESTER GLASS CO. v. HARTFORD–EMPIRE CO.**

Nos. 8658, 8659.

Circuit Court of Appeals, Eighth Circuit.

Feb. 24, 1930.

W. J. Belknap, of Detroit, Mich., and A. C. Paul, of Minneapolis, Minn. (John H. Bruninga, of St. Louis, Mo., C. P. Byrnes, of Pittsburgh, Pa., V. M. Dorsey, of Washington, D. C., and R. D. Brown, of Pittsburgh, Pa., on the brief), for Hartford-Empire Company.

E. W. McCallister, of Pittsburgh, Pa. (Green & McCallister, of Pittsburgh, Pa., and Rippey & Kingsland, and Edward E. Longan, all of St. Louis, Mo., on the brief), for Obear-Nester Glass Company.

Before STONE and GARDNER, Circuit Judges, and MILLER, District Judge.

GARDNER, Circuit Judge.

This action, brought by the Hartford-Empire Company, as plaintiff, against the Obear-Nester Glass Company, involves charges of infringement by the defendant of two patents issued to, or owned by, the plaintiff, known in this record as the Steimer patent No. 1,564,909, granted December 8, 1925, and the Peiler patent No. 1,573,742, granted February 16, 1926. The answer put in issue the validity of the patents and denied infringement, pleaded certain prior art patents, and pleaded delay and laches in the prosecution of the patent proceedings in the patent office. Both of the patents declared on in the bill of complaint relate to the automatic feeding of molten glass to a series of forming molds in which the glass charges are shaped to final form. Generally speaking, this apparatus may be described as comprising a receptacle for molten glass having an outlet from which molten glass is delivered in a stream; a device for severing this stream of molten glass and fixing the predetermined intervals, thereby separating the severed glass from the source of supply, and also into a series of molten charges; and mechanical devices for controlling this flow of molten glass. This very general description of a feeding apparatus applies to the various feeders here involved. The actual feeding of the molten glass to the molds, and the mechanical devices employed therefor, are the only things involved in this case. The question as to what happens to the glass after its delivery by and from the feeder is in no way involved in the present controversy.

The lower court held that claims 1 to 10, both inclusive, of the Peiler patent were invalid; that claims 17, 20, 24, 25, and 34 were not infringed; that claims 15, 16, 18, 19, 21, 22, 23, 26, 27, 28, 29, 33, and 36 of the Peiler patent were valid and infringed by the devices made and used by the defendants; that all claims of the Steimer patent were valid and infringed by the devices made and used by the defendant. From this decision both parties have appealed, the plaintiff appealing from the holdings of invalidity and noninfringement, and the defendant appealing from the holdings of validity and infringement.

The lower court prepared and filed a carefully written opinion, which fairly indicates the issues of law and fact involved and presents reasons and authorities in support of its decision which are so satisfactory that we approve and adopt the applicable portions thereof as follows:

"The accused device of defendant, in terms of its simplest description, comprised a furnace for melting the chemical components of glass, or, as it is called, a fining furnace, having a main part for melting and a forehearth, all old in the art; a plunger positioned in this forehearth and operable by an arm carried on an air-moved piston, so as to rise and fall in a vertical movement. This plunger may seat or not seat in the outlet for the glass, provided in the bottom of the forehearth. There is a nut on the piston-rod by which the position of this plunger may be regulated in its up and down movements, even while in operation. The compressed air is pumped through a valve, or valves, both above and below the piston, reciprocally. This pump for compressed air is operated by a chain drive moved by an electric motor.

"Below the glass outlet of the forehearth and out of contact, and, therefore, out of smearing relation with such outlet, or orifice, there is a pair of shear-blades, which in a time relation to the plunger movement is mechanically protracted and opened. These shear-blades, embrace the discharged gob of glass, as it hangs suspended, close and sever the attenuated connecting thread, and the gob falls. The shear-blades are controlled by a valve geared to a cam, on a cam-shaft by which the shear-blades may be operated in timed relation to the plunger, and thus the shear and plunger operations occur regularly and synchronously, or in a definite timed relation.

"It is possible with these valve adjustments to either advance or retard operations of the plunger relative to the operations of the shears, by moving the plunger

operations ahead or back, or the identical result may be obtained by making the change with the shear valve, so as to advance or retard the shear operation relative to the plunger operation.

"In passing, I may observe, that some considerable confusion is found in the record, which arises from the fact that counsel, to some extent on both sides, persistently insisted on comparing defendant's accused device with plaintiff's commercial device, instead of comparing the accused device with the teaching of the patents in suit, as disclosed by the specifications and claims, or by the claims as read in the light of the specifications. Obviously, such a comparison is worthless, and is not the test of infringement. It is true, aid in understanding the language of the claims may be afforded by a physical exhibit of a commercial device, but such a device affords no help, either in fact or law, until it has been shown that the physical exhibit of the commercial device has been made in every substantial compliance with the teachings and claims of the patent alleged to be infringed. Experience often discloses that commercial devices, alleged to be protected by a patent, or patents, depart substantially from the patent, or patents, themselves. So, commercial devices are not to be compared with commercial devices, but the accused commercial device is to be compared with the claims of the patent in dispute.

"The Steimer patent, in its simplest terms, has a furnace for melting the chemical constituents of glass, which, generically, is, of course, old in the art, but which concretely is of peculiar construction here, for that it is wedge-shaped and may be tilted so as to pour out its contents constantly, in a fixed volume, and from a fixed head, until the furnace is empty. This fixed head is brought about by a mechanical tilting mechanism working rhythmically with the other mechanisms, but as this part of this furnace is not at all in question here, no further mention need be made of it.

"The molten glass is poured in a constant stream from the tilting lip of the furnace into a chamber, or bowl, equivalent to the forehearth of defendant's accused device. In this chamber there is mounted a plunger, which is raised up by a reciprocating frame, to which, however, the plunger is not rigidly attached. This reciprocating mechanism, or frame, is operated by a cam moving counterclockwise, which slides under the bar of the frame, lifts the frame to the highest points of its adjustment, which point may be changed as desired by the operator, and then by cam movement slides from under the frame and permits it to fall by gravity, carrying down with it the plunger, which, as said, is not rigidly attached to the frame, but is mounted in a circular opening therein, and is kept partly rigid by a spring which presses on the head, or upper end, of the plunger. The plunger must move up with the frame, but it does not necessarily fall with the frame except in so far as it is thrust down by the spring, and its own weight. In operation, however, it ultimately seats, if desired, in the glass outlet in the bottom of the bowl, thus cutting off wholly, or partially, the flow of glass from this opening. Such connecting threads of glass as are left, after the closure of the outlet by seating, or partially seating, the plunger therein, are cut off near the exit of the orifice by jets of flame. There are no shears used by Steimer.

"There is suitable mechanism to vary the time of the rise and fall of the plunger, as compared to the period of flow of the glass through the glass outlet in the bottom of the bowl. This variance of intervals brings about a variance in the form and mass of the gob. These gobs when severed fall into a reciprocating funnel, which, moving around an orbit below, retains the upper opening of the funnel in a fairly constant vertical plane; perhaps in a wholly constant vertical plane, but that is not important, and thus delivers these gobs into any number of parison molds on a revolving table. But, again, this manner of delivery is not in issue here.

"As said, all of the six claims of the Steimer patent are in issue. These claims are so similar in meaning as that one of them may serve as a type of all. In fact, casually, they seem to present an identical single claim merely in varying language, except that claim 6 adds the element of a submerged outlet and an adjusting means, workable during operation, of limiting the movement of the plunger toward the outlet, with a change in the range of movement away from the outlet, but even this thought is expressed in other claims.

"Claim 1, taken as typical, reads thus:

" 'Apparatus for separating molten glass into mold charges, including a container for the glass having an outlet, an implement projecting into the glass toward the outlet and mounted for movement towards and from the outlet, means for periodically mov-

ing said implement toward and from the outlet and means for adjusting the nearest position of said implement to the outlet without changing its position remote from such outlet.'

"The so-called needle, or plunger form of the plaintiff's Peiler patent, is illustrated in Figs. 12, 13, 14, and 42 of the Peiler patent in suit." These drawings are as follows:

*Fig. 42.*

212
213
2ª
3ª
4ª
5ª

"In the view I take of the issues, evidence and pleadings here, I need consider but this particular form.

"These above figures were first shown in one of the alleged divisional applications filed May 5, 1919, and appear therein as Figs. 2, 6 and 7, respectively. Fig. 42 of the patent in suit does not appear in the above application of May 5, 1919, though in view of the disclosures of the three other figures, this is perhaps not vitally important.

"The construction and manner of operation of this needle or plunger form of Peiler is about as follows: There is a plunger, similar to the plunger of the accused device and that of Steimer; there is a forehearth similar or equivalent to the bowl of Steimer and the forehearth of the accused device having an outlet at the bottom. This plunger works vertically, or up and down, and may by adjustment be seated, or not seated, in the glass outlet. By this reciprocating movement it alternately opens and closes the glass outlet, or, at least, closes it to the desired approximation of the operator; thereby assists in forcing a gob of glass through the outlet, and then closing, or partially closing, the same, so that no more glass, except a connecting neck or thread, escapes. This neck, while the gob is wholly in suspension, that is, not supported from below or laterally, is then severed by mechanical shears, spaced out of contact and, therefore, out of smearing relation, with the bottom edge, or lip, of the glass outlet. These shears are protracted, opened, operated to sever, and retracted by mechanical means. It is conceded, I take it, because defendant's witness, Wadsworth, conceded it, that the shears mechanism, the problem being stated and before him, could be reproduced in one operable form or another, by any ordinarily skilled mechanic.

This concession, in passing, is also made as to the mechanisms of the reciprocal adjustments below mentioned, which produce synchronous operation of the plunger, and the severing apparatus; for, as indicated, the vertical movement of the plunger in relation to the severing operation, may be slowed or quickened, advanced or retarded at will by the operator while the machine is working. So, that gobs of glass differing in mass and shape may be delivered.

"In the Peiler patent, these severed gobs fall on a moistened chute, instead of into a funnel, or into a parison mold, as is, respectively, taught by Steimer and by defendant's accused device. In Steimer, of course, as already stated, these gobs first fall into a funnel, which seems to direct them into the parison mold. But this function is not involved in this controversy, as already forecast.

"In this situation, and upon the above facts of operation, respectively, plaintiff bases its contention of infringement. As seen, many claims are involved in the Peiler patent. Some of these are the alleged method claims, and some are the apparatus claims. For reasons, which I shall later set out, I need not now consider the method claims. A typical apparatus claim, as plaintiff's counsel urge, is found in claim 36 of the Peiler patent, which reads thus:

" 'Apparatus for feeding molten glass in a regular succession of freely dropping charges appropriate to the molds to be fed, comprising an impulsion chamber in communication with the tank of a glass melting furnace and having an outlet orifice submerged under a head of the molten glass, a plunger working in the glass above the orifice and serving in conjunction with the surrounding walls of the impulsion chamber to exert impulses tending alternately to expel the glass through the orifice and to retard its outflow, shear blades movable toward and from each other and coacting below and in line with but independently of the outlet orifice to sever the suspended end of the issuing column of glass in timed relation to the plunger movements, and means for adjustably varying the movements of the shears and plunger with respect to each other to regulate the freely dropping mold charges severed by the shears, and to keep them uniform after the desired regulation is obtained.'

"I think it is clear, from the above statement of construction and operation of the accused device, when compared with the six claims of the Steimer patent, and claims 15, 16, 21, 18, 19, 22, 23, 26, 27, 28, 29, 33 and

36 of the Peiler patent in suit that defendant's accused device reads on the above claims, and infringes each and all of them, that is to say, of the six claims of the Steimer patent and of the above mentioned claims of the Peiler patent, provided such patents and the above claims are valid.

"I conclude, for reasons I would as well now state, that claims 1 to 10, both inclusive, of the Peiler patent (the so-called method claims) are invalid, and so I need not consider whether or not they are infringed.

"Claims 1 to 10, supra, are, as forecast, so-called method claims, and involve the notion of patenting the concept of 'phase-changing,' as plaintiff denominates it. I am not able to see that the phase-changing here contended for by plaintiff is anything more than a function. In short, it involves the problem to be solved, and not the mechanical method of solving such problem. It is fundamental, that a mere function ordinarily cannot be patented in a mechanical patent. Holland Furniture Co. v. Perkins Glue Co., 277 U. S. 245, 48 S. Ct. 474, 72 L. Ed. 868.

"Phase-changing which occurs here is the mere mechanical means of varying, and governing, the interval which intervenes between the emergence of the gob of glass and its being severed by the shears. This gob hangs suspended, for an interval regulable by the machine, or by the operator who operates the machine. It is, while suspended, subjected to well-known physical laws, which change its length and diameter, and then at an interval for which the machine is adjusted, or may be adjusted, it is severed and falls. This same sort of phase-changing occurred whenever the ancient hand-gatherer and his assistant, who wielded the shears, were called upon to mold either a larger or smaller vessel than they had before been making.

"The problem of measuring the interval between the separation of the gob from the punty and the severing of the latter, which interval, in the old hand art, of course, included the period in which the gob was subjected to physical laws, which shaped it, was not invented by plaintiff, or by either Peiler or Steimer. It has always existed. The problem, to state it in a slightly different way, was to precisely synchronize this interval by a machine, and to maintain this synchronism at will, but at the same time, in the same machine, to be able to change the interval of suspension at will, and while the machine was in operation, and thus permit physical laws to do the rest.

"To my mind, then, it is too obvious for exposition, that this same sort of phase-changing was inevitably present by reason of human error, as well as by reason of human intention, when the ancient hand-gatherer took a gob of melted glass from the furnace with his hand punty and held it over a mold until a part of it sagged down from the punty and separated therefrom, except by the connecting neck, which neck, at an interval measured by the eye and mind of the shear wielder, was then severed by the latter. The difficulty (now solved, as it is urged, by plaintiff's patents) was that the intervals of manipulations of the punty, of the flow of glass therefrom toward the mold, and of the severing of this gob by an assistant, could not, on account of human error, be made always and uniformly precise. Inevitably, there was almost always a lack of uniformity among each of these intervals. Hence, inequalities in mass, weight and shape were present. So, the one problem was to mechanically provide precise and regulable uniformity in these intervals, through a machine, which would sever the suspended gob at fixed intervals, and the other problem was to be able to vary this interval and, therefore, the mass and shape of the gob, at will and without stopping the machine.

"If, then, plaintiff, by its method claims, contends, as I understand it does, that for the life of this Peiler patent no one, by whatever mechanical means, may eject from a furnace a gob of melted glass, suspend the same unsupported, either from below or laterally, for a regulable period, and then at a predetermined interval, changeable while operating and at will, sever the gob, I am of opinion, for the reasons above given, that it may not patent this notion. Besides, I think there are other reasons bottomed on the fact that many other patents in the prior art disclose the notion of phase-changing, although they did not appropriate the designation, or attempt to do so. I have no doubt, however, that Peiler improved upon all such.

"So, I think both patents in suit are combination patents. Protracting and retracting mechanical shears, the plunger to force a definite mass of glass out of a vertical outlet, and synchronous coaction between the shears' action, and the plunger movement, are found, crudely, at least, present, or plainly forecast, in many patents of the prior art. But I think it is clear from this record, that Steimer largely improved upon all of them, and that Peiler improved upon Steimer. If, then, the Steimer and Peiler patents are not invalid because of the delays

in prosecuting to a grant their original and divisional applications, judgment of validity may well go for them.

"As said, Steimer filed his original application on the twelfth day of February, 1910, and his patent was not issued until December 8, 1925. After a most careful and pains-taking examination of his original application, I am of the opinion that it, as originally filed, disclosed in the specifications and drawings, especially the latter, ample basis for each of the six claims finally allowed. Peiler, in his original application did not disclose the specific form here found to be infringed by the accused device, until he made his divisional application on May 5, 1919. In the latter application, or in one of them (for he made two on the same date), Peiler first showed that form which defendant has infringed. Upon plaintiff's contention, he did show his generic invention, in his original application of August 3, 1912.

"From October 24, 1916, to September 27, 1924, almost up to the date of issue of the patent, Steimer was engaged in combatting interferences almost too numerous to mention. Likewise, from January 18, 1916, to August 17, 1925, or shortly before the patent was issued to his assignees, Peiler was enmeshed in interferences.

"I do not think delay, laches or estoppel can, therefore, be imputed to either Peiler or Steimer for the period subsequent to 1916, and until their respective patents issued. I am not saying that estoppel, delays and laches could never, or under any state of facts, be imputed to an applicant for delay caused by the pendency of an interference proceeding, but am saying that here no facts exist upon which to bottom invalidity arising from laches, delays or estoppel, after 1916. An applicant might, perhaps, be guilty of laches in the matter of prosecuting or defending an interference. But no proof of such delay so occurring appears in this record; that is to say, of unnecessary and illegal delays in prosecuting or defending interference proceedings.

"But it is insisted that Peiler (and Steimer, as well, but I deal with Peiler, because the facts contended for by defendant are, in his case, the most flagrant) made, after his original and so-called generic form of device, four divisional applications and amendments for as many specific forms. (There are five, in fact, but the last one, dealing with Peiler's bowl-spout-paddle-needle form, is not, in my opinion, involved in the infringement.) And that, since more than

two years elapsed after the original application was filed until the filing of the first divisional application and thereafter more than two years elapsed between subsequent divisional applications, he is ipso facto barred from tying any of his specific divisional applications to his original generic application, or from tying a divisional application to a preceding divisional application, and so his patent is invalid. In other words, that there exists in the law of patents a fatal two-year rule of limitations, which precludes the filing of a divisional application, or an amendment of the original application, after the lapse of two years. Here, in one case only, was an amendment made, or a divisional application filed, in less than a year after the last preceding divisional application. This was the application for the so-called paddle form of Peiler, which was filed March 28, 1917. The last preceding divisional application had been filed on March 7, 1916, less, of course, than two years. But clearly, this will not save Peiler from invalidity if the rule contended for by plaintiff is the law.

"The point is one with which, and with its variables upon varying facts, the courts have had much trouble. The law is yet seemingly in the process of crystallization as to what shall be the final rule. It has been up for judgment in a number of cases in the Supreme Court of the United States, among which the leading cases are Chapman v. Wintroath, 252 U. S. 126, 40 S. Ct. 234, 64 L. Ed. 491; Webster Electric Co. v. Splitdorf Electric Co., 264 U. S. 463, 44 S. Ct. 342, 68 L. Ed. 792; Overland Motor Co. v. Packard Motor Co., 274 U. S. 417, 47 S. Ct. 672, 71 L. Ed. 1131; Milburn Co. v. Davis, etc., Co., 270 U. S. 390, 46 S. Ct. 324, 70 L. Ed. 651, as, also, in the very late case of Wagenhorst v. Hydraulic Steel Co., 27 F. (2d) 27, from the Sixth Circuit Court of Appeals.

"From the above cases, I am of opinion that no hard and fast rule exists whereby the lapse of more than two years between the date of the original application and a divisional application, or between divisional applications, creates an absolute bar to validity, ipso facto. It is not safe to attempt to lay down a thorough-going rule, or to pass upon all possible phases of this question, until they shall be met face to face in a concrete case, and the Supreme Court has wisely refrained from doing so. * * *

"However all this may be, the rules, so far as they seem to be made rules by stare

decisis, and so far as the cases have gone, I construe thus:

"(a) If, in an application for a patent, functions are present and disclosed, but not claimed, the filing date of the original application will be deemed the date of the reduction to practice of all functions and potential claims so present, but not claimed, and subsequent claims. will, ordinarily, relate back to such original filing date.

"(b) The applicant may, in the presence of such disclosure of functions unclaimed, pending prosecution, amend his claims, or file divisional applications on specific forms generically disclosed, in the original application, as, of course, at any time within two years after filing the original application.

"(c) The applicant may so amend or file divisional applications even where, within the two years, applications are filed by strangers claiming the functions existing and disclosed (but not claimed) in and by the original application.

"(d) Absent estoppel in pais, through accrual of public or private rights, such amendments of claims, or the filing of such divisional applications, may be allowed more than two years after the original application is filed, or after the last preceding divisional application is made. (e) But if a patent, which makes claim to the subject-matter present and disclosed in the application of the original applicant, but not claimed by the latter, shall have been issued to a stranger more than two years after the original applicant files his original application, the latter can thereafter neither amend his original claims (so as to broaden them) nor file a divisional application, embracing claims, so after two years patented to a stranger.

"I deduce these rules from the cases I cite above, from the Supreme Court, both as I construe these cases, and as they are construed in the late and most excellent opinion of Judge Denison, in the case of Wagenhorst v. Hydraulic Steel Co., supra.

"Applying these rules to the facts here, I am of the opinion that the patents in suit are not invalid because of delays, estoppel or laches. * * *

"I am also of the opinion that the claims of these patents in suit are not anticipated by the prior art patents in evidence. Those largely relied on by defendant, as anticipatory, are: Brookfield, No. 883,779; Cleveland, No. 901,881; Hitchcock, No. 805,067 and No. 805,068; Mansfield, No. 854,511;

Morrison, No. 810,167; Proeger, No. 1,-059,634; Schulze-Berge, No. 421,620; Severin, No. 892,013, and the French patent to Wilzin, No. 439,150.

"I have very carefully considered the construction, operation and outstanding features of each of the patents mentioned.

"Brookfield, issued in 1903, had a valve, so-called, similar to the Steimer and Peiler plunger, but no suspended charge, or severing shears, or means out of smearing relation, and no means to change the operating phase while in operation.

"Cleveland, issued in 1908, is practically similar to Brookfield. What is said as to Brookfield may be said, generally, as to Cleveland, and it is difficult to understand why a patent was issued to him, in the light of the prior art as shown by Brookfield.

"Hitchcock, issued in 1905, used compressed air to force glass from the forehearth, but he did not sever suspended charges out of smearing relation with the lip of the outlet.

"Also, Brookfield, by creating a partial vacuum, retracted glass above the plane of severance.

"The other patent of Hitchcock, issued also in 1905, and above mentioned, differed but little, so far as concerns operation, from the first-mentioned Hitchcock patent. There are to be found little differences as to the mechanics of operation. The essential elements seem very similar, and, again, cause a question to arise as to why he was able to obtain the latter patent. over his former disclosure.

"Mansfield, issued in 1906, uses rolls to force or roll out glass from the furnace, or melting hearth, and he cuts the gob, so rolled out, while it is supported on a cooled plate. This cut is made in smearing relation to a horizontal outlet.

"Morrison issued in 1906, employs a plunger, which reciprocates, but which cannot be changed as to time and length of stroke while in operation. The gob of glass severed falls directly into parison molds set in a revolving table, and the gob is cut off right at the exit, by shearing action of the mold cup edges when the latter are revolved against the lower edge of the exit.

"Proeger, issued in 1913, employs a vacuum chamber, which alternately forces out a gob of glass, which is cut off by an electric spark. He uses no plunger, such as is disclosed, at least, by the patents in suit.

"Schulze-Berge, issued in 1890, employs a vacuum chamber into which compressed air is introduced, which produces a varying intermittent flow, from an exit which stands at an angle of about forty-five degrees. There is supposed to occur a pulsating discharge. No means, except gravity acting on the size of gob ejected, are shown to sever the gob. It is either severed, or may be severed, by shears manually operated by a worker, or by some of the mechanisms of the prior art, but no method of severance is shown.

"Severin, issued in 1908, employs a plunger, which works practically or wholly hermetically, in, I believe, a measuring chamber in the bottom of the forehearth. There is a pulsating discharge of the glass, which vertically flows from a spout. No cut-off means are shown, except gravity, or the assumption of hand-operated shears.

"The French patent of Wilzin, No. 439,-150, disclosed a stream-feeder, actuated by a plunger, but it did not suspend the charge; hence, no means to vary the lengths exist, and it did not sever the gob out of smearing relation with the exit.

"Some other patents in the prior art, among the one hundred and forty-two pleaded here, may have some relevancy. I have examined all of them which were referred to by the witnesses as being the closest. Those I have referred to, and briefly explained above, seem to me, as they seemed to the experts, to be the most nearly relevant. It may be conceded, that some of them, in every case very crudely, show one element of the patent in suit, and some of them another, but none of them discloses the combinations, in their entireties, and then, as said, but crudely.

"Steimer and Peiler made great improvements, which of themselves show invention. Devices made under their patents became almost at once popular, and have all but occupied the whole field. The fact of the grants and the great public acclaim, are to be considered as creating presumptions of validity, when validity is in doubt.

"As to the validity of some of the claims of Peiler, I am in doubt, greatly in doubt, but I resolve these doubts in favor of such claims, by consideration of the presumption of validity arising from the fact of grant, and from the fact of great commercial acclaim. The ten long years of contests and interferences in the Patent Office would seem to create the inference that the claims of Peiler and Steimer were sub-jected there to the very greatest and most careful scrutiny.

"I conclude that claims 1 to 6, both inclusive, of the Steimer patent in suit, are valid, and are infringed by the defendant's accused device; that claims 15, 16, 18, 19, 21, 22, 23, 26, 27, 28, 29, 33, and 36, of the Peiler patent are valid and infringed by the defendant's accused device; that claims 1 to 10, both inclusive, of the Peiler patent are invalid, and that claims 17, 20, 24, 25 and 34 of the Peiler patent in suit are not infringed by defendant; hence, I do not pass on their validity. The other claims, not mentioned above, are not declared on in the bill of complaint; hence, they are not in issue."

For the reasons stated herein, the judgment of the lower court should be, and is, affirmed.