**BARBER ASPHALT CO. v. STULZ–SICKLES CO. et al.**

No. 6171.

Circuit Court of Appeals, Third Circuit.

April 19, 1937.

THOMPSON, Circuit Judge, dissenting.

Busser & Harding, of Philadelphia, Pa. (Frank S. Busser and George J. Harding, both of Philadelphia, Pa., of counsel), for appellant.

Samuel Ostrolenk, of New York City, for appellees.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

The primary question in this case is the validity of patent No. 1,684,671, granted September 18, 1928, to Harold P. Hayden, assignor to Barber Asphalt Company, the present plaintiff, for "method of preventing evaporation from concrete during curing." The practice of the art prior to the patent in suit, the objections thereto, the novel means the patentee disclosed to overcome these objections, their effectiveness and money saving, are set forth in his patent specification, which we adopt, in view of the proofs, as the facts of the case, to wit:

"In modern cement concrete construction it is desirable to retard the evaporation of water from the concrete after it is placed and during the curing period in order to insure thorough hydration of the cement and thus produce a concrete of maximum strength.

"Heretofore various methods of protecting concrete during the curing period, especially in roadway and the like construction where the concrete has a large exposed surface, have been used, for example, one well known method used in roadway and the like construction involves the application of wet burlap to the exposed surface of the concrete immediately after finishing, the burlap being kept wet, as by sprinkling, until the concrete has set, or attained a rigidity such as to withstand a substantial weight without marring, after which the burlap is removed and the surface covered with earth, or straw, which is maintained wet until the expiration of the stipulated curing period, when the earth, or straw, is removed. Another method, which has been attempted, involves the spreading of tar on the surface of concrete

after the concrete has set, or attained a rigidity such as to enable workmen to walk on it without marring the surface. Still another method involves the provision of dikes about the concrete for maintaining a pond of water on its surface until it is ready for use.

"The methods heretofore used for protecting concrete during the curing period are open to numerous objections, more especially in that they involve substantial expense and are ineffective in preventing the evaporation of water from the concrete during the critical period before the concrete has set, or the protection of the concrete is not attempted until substantially after the critical period has passed, as is evidenced, for example, by the occurrence of hair cracking, which is avoided by the practice of the method according to my invention.

"I have discovered that if cement or cement concrete be treated, after it is finished, i. e., smoothed off, or broomed if so finished, and before it has set, i. e., before it will support a substantial weight, such as that of a man walking on it, without marring, by the formation on the exposed surface thereof a water impervious film, which preferably will adhere to the concrete, and the concrete be then permitted to set and cure without disturbance, the concrete will cure without hair cracking, and when cured will be found to have greatly increased strength, durability and resistance to weathering as compared to concrete treated by the methods heretofore known.

"In accordance with my invention, I apply the water impervious film to the exposed surface of cement or concrete to be cured before it has set, by which, as has been indicated, I mean before the concrete has attained a condition of firmness or rigidity such that it will support a substantial weight without marring of the surface, as for example, the weight of a man walking on it. Preferably, the film is applied as soon as practical after the cement or concrete is laid and finished; however, it must be applied before the concrete has set, as indicated above, if the benefits of my invention are to be obtained.

"In accordance with my invention, the water impervious film, when applied before the cement or concrete has set, as indicated, acts to prevent evaporation of water from the cement or concrete, and especially from exposed surface thereof, or to retain sufficient original water in the cement or concrete, during that period in which the continuous presence of requisite water is essential for the hydration of the cement and the avoidance of hair cracking of the surface.

"As illustrating different applications of the principle of my invention I will give the following examples:—

"A bituminous paint such as ordinary liquid asphalt paint, consisting of a residual asphalt base of twenty to thirty penetration at 77° F., or native asphalt, dissolved in a volatile petroleum solvent may be used as the coating for this purpose. Such a paint when applied, for example at the rate of one gallon per 100 sq. ft. as soon as practical after pouring and finishing of the concrete, but in any event before the concrete has set, will form a satisfactory protective impervious film, and prevent evaporation of water from the concrete during curing.

"Ordinary linseed oil paint will also form a satisfactory impervious film if applied in sufficient quantity after the superficial water has subsided after pouring and finishing of the concrete.

"Still another method of practicing my invention, and one that is distinctly preferred possesses further advantages. To the surface of wet unset concrete and preferably as soon as practical after laying and finishing I apply, as by means of a spray, a water-external-phase bituminous emulsion such as is often called in paving practice 'cold repair cement.' Such emulsion possesses the property of breaking after a short exposure to the air inconsequence of the evaporation of the water, with the formation of a water impervious adherent film of bitumen on the surface of the concrete.

"I have found that cement concrete which has thus been protected by the application thereto, when freshly placed, or before it has set, of a water impervious and preferably adherent film possesses a remarkably higher tensile strength after curing or aging than is possessed by the same concrete not so treated, and the occurrence of hair cracks is avoided.

"Films of this character may be formed with great ease by applying the coating medium by means of a paint spray. In roadway construction a bituminous emulsion

may be applied as soon as the surface is finished.

"The cost of material and labor involved in this method of treating concrete is relatively low, in comparison with the cost of materials and maintenance in a moist condition by any other method of treatment, and the results are not dependent upon the subsequent care of the work after the film is once in place it being only necessary after the application of the film to permit the concrete to set and become sufficiently cured without disturbance of the body thereof.

"When using the old methods, it is frequently impossible to keep concrete properly wetted for the requisite curing period, but with my new method the curing proceeds without interruption to completion. This is of particular advantage in road construction as construction traffic may be directed over the new concrete after say one week without interrupting the curing of same."

Upon this disclosure, there was granted, inter alia, the here involved claims 4, 5, and 9, as follows:

"4. The method of preventing evaporation of water from the surface of a freshly laid concrete roadway which includes spraying upon such surface, before the concrete has set, a bituminous emulsion for the formation of an adherent water impervious bituminous film thereon.

"5. The method of curing a concrete roadway which includes applying to the upper surface of a roadway, before the concrete has set, a coating of unheated bituminous paint-like material for the formation of a water impervious film thereon and permitting the concrete to cure."

"9. The method of curing a body of cement concrete having an exposed surface, which includes applying to the exposed surface of the concrete, before the concrete has set, a water-external-phase bituminous emulsion for the formation of an adherent water-impervious film on such surface and thereafter permitting the concrete to cure without substantial disturbance of the body thereof."

The make-up of concrete and the action of water in forming it are well known. It is caused by the chemical action of water on powdered Portland cement mixed with sand and crushed stone. When first mixed, the resultant is physically, as the proofs show, very soft and offers no re-sistance whatever to any weight placed on it or anything coming in contact with it. It would immediately sink of its own weight. But hydration, or the action of the water, goes on and in a few hours the mixture is "set." Thereafter the hydration proceeds constantly and "cures" the mix, with the result of stonelike hardness being attained. Describing the practice prior to the patent in suit, an experienced engineer testified:

"Q. 39. What disadvantages found in roadways prior to the summer of 1925 are cured by the operation of the Hayden process? A. Considerable difficulty was encountered in roads at that time due to what is known as surface crazing or cracking. That means formation of what are sometimes referred to as mat cracks on the immediate surface of the concrete, and those cracks result from the shrinkage of the surface due to the loss of water and the mere fact that the concrete is shrunk at that point indicates that certain changes are going on which are likely to be disastrous as far as the surface resistance of the concrete is concerned.

"Q. 40. How about the hydration of the cement during that period? A. Well, the hydration of the cement will continue so long as water is present, but the moment the water is removed the hydration ceases.

"Q. 41. Was the hydration of the cement adjacent to the surface of the roadway interrupted or continuous during the methods used for the protection or rather lack of protection during the settling period prior to 1925? A. It was interrupted by the premature drying of the surface and the attempt later to put water on to correct that.

"Q. 42. Did that subsequent application of water correct the harm done during the settling period or not? A. It does not.

"Q. 43. And how did that show up in the final road in use? A. It shows up by abrasion of the surface, producing a rough surface after the road has been under traffic for some time.

"Q. 44. Was the surface concrete of such a road as good as what I may call the main body of the slab? A. It was not; the surface was very much poorer than the main body of the concrete."

Describing the hydration of the existing art, the critical state of the concrete when laid, and the bringing of a bituminous

emulsion into roadway construction, and that the problem was one reached only after original and protracted experimentation, is shown by Hayden, who testified:

"Q. 28. Your original concept despite your original use of emulsion for the formation of this film, included the use of other bituminous film forming materials, did it not? A. Yes, we studied paint-like materials, solutions of bitumen in volatile solvents, for example.

"Q. 29. Now, does the bituminous emulsion have any particular advantage over other paint-like materials? A. In our opinion it does.

"Q. 30. Will you explain how the bituminous emulsion affects the formation of a film after it is sprayed on the surface of the wet concrete and how it is advantageous, for example, over a solution of bitumen in an oil of some kind? A. The bituminous emulsion is usually made with a soap as the protective colloid. This soap is a chemical compound which is constituted by the combination of an organic acid such as oleic acid or abietic acid with sodium; in other words, the soap might be sodium oleate, that would be the simplest type of soap. When this emulsion system is brought in contact with the surface of the concrete it encounters calcium ions which are in solution in the mixing water, and calcium, which is actually in the ingredients of the concrete. When the soap of the emulsion makes contact with this calcium or other earth metal salts, ions, the soap is converted into an insoluble soap. To illustrate the difference between the soluble and insoluble soap, we might refer to the ring in the bathtub. The soap you see in the bathtub is the soluble sodium oleate essentially. You bring it in contact with the calcium salts in the water and it is converted into an insoluble calcium soap."

Testifying as to his method. supplanting the use of burlap, Hayden's testimony was:

"Q. 58. Is it possible to apply burlap without marring the surface within the critical and essential period in which you apply your bituminous film? A. Scarcely. There has been improvement since my invention came to issue but it is scarcely possible to apply—it is impossible, as a matter of fact, to apply burlap as early as it is possible to apply this bituminous film.

"Q. 59. Then I do understand— A. On account of marring the surface. You can readily see that if the bituminous film is applied as an atomized spray that it may be applied without marring at once as soon as the finisher has completed his task, whereas in the application of burlap the inspectors will not permit the application of the burlap until the surface has assumed sufficient strength to resist the very slight abrasion effect of the burlap during its applications. * * *

"Q. 63. Is it necessary after the application of the bituminous film in accordance with the method of your patent to do anything else with respect to protection or conditions of water? A. One of the particular merits of our invention seems to be the positive indication of adequate application, the contrast in color between the bituminous film and the gray surface of the concrete permits the inspector to determine at a glance that the surface is entirely covered and he needs worry about it no more during the curing period.

"Q. 64. Is it necessary to do anything at all after you cover the surface with the bituminous film? A. The road is barricaded but otherwise nothing is done.

"Q. 65. Is it necessary to add any water to it, to sprinkle it? A. No water could get to the concrete if applied. The film is impervious.

"Q. 66. Is it necessary to put any hay or straw over it? A. It is not."

Without entering into details, the proofs show that the process of the patent has increased the surface strength of the roadway 40 per cent. and has gone into extensive use. Indeed, an experienced witness for the defendant pays tribute to it, saying: "The beauty of this patent is to reduce expense decidedly * * * it is a very valuable addition to the art, your patent. It spurred others to find some new way to compete with it." Indeed, when we consider the fact that the use of masses of burlap bags, damp soil, and tarpaulins covering miles of roadway, was done away with and in their place was substituted as an enveloping, moisture-retaining agency, an invisible, weightless spray of bituminous emulsion which more quickly effected a material increase of roadway surface hardness, we have before us an invention which, if not a pioneer, is certainly one of very high merit.

After practical examination and, as we see it, after receding from its earlier view, the Patent Office granted the claims here involved with the limitation of using the spray "before the concrete is set." Thus in claim 4 we have the element "spraying upon such surface, before the concrete has set, a bituminous emulsion"; in claim 9, applying "before the concrete has set, a water-external-phase bituminous emulsion"; and in claim 5, applying "before the concrete has set, a coating of unheated bituminous paint-like material."

From the proofs it is clear that these elements, (a) the bituminous emulsion, (b) the spraying of it, and (c) the doing so before the concrete is set, are the gist, so to speak, of Hayden's process. And if such is the case, this eliminates the German patent, No. 337,134, issued in 1921 to Lechler, which the court below considered a complete anticipation.

Lechler, in his disclosure, stated the well-known fact that "cement concrete attains great strength much more quickly if it is kept moist during the hardening (lapidifying) period," and that his new process consists in that the still-fresh concrete is so inclosed on all sides with a coating material which is resistant to water. He nowhere referred to or disclosed any suggestion of its use in roadway construction or of spraying a bituminous emulsion. On the contrary, his primary idea was to use forms to shape concrete articles, and after such articles were set, remove them from the forms and then dip them in a bituminous bath—whatever it was. His directions were: "Cement articles, as soon as they have sufficiently set and can be removed from the form, are dipped in the coating material, or are coated therewith on all sides." Manifestly, this threw no light on road construction, and that art, furnished, as it was, with able engineering staffs, eager for improvement, continued to use the old methods for the seven years that intervened between Lechler's and Hayden's patents. Nor does Lechler's suggestion of the use of his patent in "concrete structures, such as retaining walls, foundations, and the like," throw any light on concrete roadway construction. There is no proof as to how such process could be practically used and the proof is that it could not be practically utilized. It will thus be seen that Lechler failed to meet the standard of anticipation laid down by this court in Skelly Oil Co. v. Universal Oil Products Co., 31 F.(2d) 427, 431, that: "A patent relied upon as an anticipation must itself speak. Its specification must give in substance the same knowledge and the same directions as the specification of the patent in suit."

The patent being valid, we next consider the question of infringement. The stipulation is that the Standard Bitulithic Company used the patented process in road construction in this circuit in 1933. Having no license, a decree must and would have gone against it had it been a party to this suit. In point of fact, the defendants are two companies which are charged with contributory infringement. As to their contribution to the infringing wrong, the stipulation is: "That the defendants, Stulz-Sickles Company and Leitch Manufacturing Company, Inc. in August and September, 1933, sold and delivered to Standard Bitulithic Company, at Newark, New Jersey, a quantity of bituminous (asphalt) emulsion, with knowledge that the emulsion was to be used by Standard Bitulithic Company for the curing of a concrete roadway in Newark, New Jersey, by spraying the emulsion on the surface of unset, freshly laid, uncured concrete roadway, for the formation of a waterproof bituminous film on the surface of the roadway, for the prevention of the evaporation of water from the concrete during curing; and such emulsion was sold and delivered by the defendants, Stulz-Sickles Company and Leitch Manufacturing Company, Inc. to Standard Bitulithic Company, for the curing of a concrete roadway, as described; and that such emulsion was, in fact, to the knowledge of the defendants, Stulz-Sickles Company and Leitch Manufacturing Company, Inc., used by Standard Bitulithic Company, in August and September of 1933, at Newark, New Jersey, as described, the concrete roadway being left undisturbed until cured after the spraying of the emulsion on the surface thereof. Defendants, Stulz-Sickles Company and Leitch Manufacturing Company, Inc., admit that said asphalt emulsion sold and delivered by defendants, as stipulated in Paragraph 4 hereof, was used by Standard Bitulithic Company, in August and September of 1933, at Newark, New Jersey, for curing concrete roadway in accordance with the method defined by the claims of the patent No. 1,684,671 in suit, and that said asphalt emulsion was sold and delivered by the defendants to Standard Bitu-

lithic Company with knowledge that it was to be so used."

Notwithstanding their willfully and purposely aiding, abetting, and making possible the contractor's deliberate infringement of the patent, the defendants claim immunity by reason of the fact that Hayden's application was assigned to, and the patent granted to, the Barber Asphalt Company, the plaintiff. It was a dealer in bituminous emulsion—an unpatented product—and it is contended to hold them as infringers would be giving the patent a monopoly of an unpatented article. In support of such contention they cite Carbice Corporation v. American Patents Development Corporation, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819. We cannot agree with that contention. In that case the patent was for a container, and such container the patentee had sold to the defendant and in selling sought to restrict the buyer's use in the container of an unpatented product made by the owner of the patent. This, the court held, the patentee could not do. Having sold the container, the patentee granted to the buyer the unrestricted use to him.

The case before us is wholly different. There was no sale of the process to the contractor; no relation whatever existed between him and the patent owner. He is a simple infringer, nothing else, and the defendants, who stand in no different light, charged with knowledge of the patent, advised that the contractor intended to infringe, in order to profit thereby, sold to such contractor their bituminous emulsion, whereby the contractor could infringe the patented process. The question of whether the Barber Company, as owner of the patent, could, in granting a license, limit its licensee to using its bituminous emulsion, is not here involved and on that question we express no opinion.

In the present case, the defendants are contributory infringers and, so holding, the decree dismissing the bill is vacated and the record remanded, with direction to the court below to enter a decree adjudging the claims in issue valid and infringed and awarding an accounting.

THOMPSON, Circuit Judge (dissenting).

The appellant seeks to restrain the sale of an unpatented ingredient used by it in its process. No patent could have been obtained for bituminous emulsion, a staple article of commerce, and the fact that it is used in the patented process does not entitle the appellant to a monopoly therein. Carbice Corporation v. American Patents Corporation, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; Miller v. Electro Bleaching Gas Co. (C.C.A.) 276 F. 379. In my view the bill was properly dismissed and the decree of the court below should be affirmed.