BARBER ASPHALT CORPORATION et al.
v. LA FERA GRECCO CONTRACTING
CO. et al. (STULZ–SICKLES CO., Inter-
venor).

Civ. A. No. 13.

District Court, D. New Jersey.

Dec. 22, 1939.

Pitney, Hardin & Skinner, of Newark, N. J. (George J. Harding and Hayward H. Coburn, both of Philadelphia, Pa., of counsel), for plaintiffs and defendant on counterclaims.

Osborne, Cornish & Scheck, of Newark, N. J. (Samuel Ostrolenk, of New York City, of counsel), for defendant, intervenor and counterclaimants.

FORMAN, District Judge.

This suit is brought by Barber Asphalt Corporation[1], legal title owner of the patent in suit, and the Johnson-March Corporation, exclusive licensee, against La Fera Grecco Contracting Company for direct infringement of United States Letters Patent No. 1,684,671, dated September 18, 1928, to Harold P. Hayden for Method of Preventing Evaporation from Concrete during Curing. Stulz-Sickles Company, a dealer in bituminous emulsion, intervened as a party defendant. Validity and infringement are denied. A further issue is advanced in the counterclaim of the defendant and intervenor. Thompson Materials Corporation is joined as a defendant therein. It is alleged that a conspiracy between Barber Asphalt Corporation, Johnson-March Corporation and Thompson Materials Corporation to stifle free competition in the sale of bituminous emulsion was formed contrary to the laws of the United States.

Concrete consists of an intimate mixture of cement, sand, gravel or crushed rock and water. It has long been known that an abundance of water is indispensable to the proper curing of concrete after it has been laid, because evaporation of the original supply of water in the mixture in the normal course would result in cracks. This additional supply of water may be superimposed by wetting the surface of the concrete. Hayden has improved this means of treatment and has avoided the necessity of additional water. His method retards the normal evaporation of the original water supply. To effect this result his patent provides that the surface should be sprayed with bituminous emulsion after the concrete is laid. This forms

---

[1] Successor to Barber Asphalt Company.

a water-impervious, adherent film and prevents the escape of the water, insuring a gradual dehydration. It is to be observed at the outset that Hayden lays no claim to the chemical composition of bituminous emulsion—an unpatented staple article of commerce—produced in the United States by many concerns and in common use by their customers for many purposes.

The validity of the patent has heretofore been sustained by the courts in the case of Barber Asphalt Company v. Stulz-Sickles Company et al., 3 Cir., 89 F.2d 960, reversing, D.C., 14 F.Supp. 212. On appeal the Supreme Court denied plaintiff's claim for relief on the ground that it sought by its method of doing business to extend the monopoly to unpatented material used in practicing the invention. Leitch Mfg. Co. v. Barber Co., Inc., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371.

Of the patent the Circuit Court of Appeals for the Third Circuit had this to say: "The make-up of concrete and the action of water in forming it are well known. It is caused by the chemical action of water on powdered Portland cement mixed with sand and crushed stone. When first mixed, the resultant is physically, as the proofs show, very soft and offers no resistance whatever to any weight placed on it or anything coming in contact with it. It would immediately sink of its own weight. But hydration, or the action of the water, goes on and in a few hours the mixture is 'set.' Thereafter the hydration proceeds constantly and 'cures' the mix, with the result of stonelike hardness being attained." 89 F.2d 960, 962.

"* * * Thus in claim 4 we have the element 'spraying upon such surface, before the concrete has set, a bituminous emulsion'; in claim 9, applying 'before the concrete has set, a water-external-phase bituminous emulsion'; and in claim 5, applying 'before the concrete has set, a coating of unheated bituminous paint-like material.'

"From the proofs it is clear that these elements, (a) the bituminous emulsion, (b) the spraying of it, and (c) the doing so before the concrete is set, are the gist, so to speak, of Hayden's process. And if such is the case, this eliminates the German patent, No. 337,134, issued in 1921 to Lechler which the court below considered a complete anticipation.

"Lechler, in his disclosure, stated the well-known fact that 'cement concrete attains great strength much more quickly if it is kept moist during the hardening (lapidifying) period,' and that his new process consists in that the still-fresh concrete is so inclosed on all sides with a coating material which is resistant to water. He nowhere referred to or disclosed any suggestion of its use in roadway construction or of spraying a bituminous emulsion. On the contrary, his primary idea was to use forms to shape concrete articles, and after such articles were set, remove them from the forms and then dip them in a bituminous bath—whatever it was. His directions were: 'Cement articles, as soon as they have sufficiently set and can be removed from the form, are dipped in the coating material, or are coated therewith on all sides.' Manifestly, this threw no light on road construction, and that art, furnished, as it was, with able engineering staffs, eager for improvement, continued to use the old methods for the seven years that intervened between Lechler's and Hayden's patents. Nor does Lechler's suggestion of the use of his patent in 'concrete structures, such as retaining walls, foundations, and the like,' throw any light on concrete roadway construction. There is no proof as to how such process could be practically used and the proof is that it could not be practically utilized. It will thus be seen that Lechler failed to meet the standard of anticipation laid down by this court in Skelly Oil Co. v. Universal Oil Products Co. [3 Cir.], 31 F.2d 427, 431, that: 'A patent relied upon as an anticipation must itself speak. Its specification must give in substance the same knowledge and the same directions as the specification of the patent in suit.'" 89 F.2d 960, 964.

The quotation above recognizes the claim of the Hayden patent for the application of bituminous emulsion prior to the "setting" of the concrete. The word "set" as used in the patent is a term familiar to those with experience in the laying of concrete, and is descriptive of the period in which the evaporation-deterrent is applied. The industry recognizes that the curing of concrete is divided into two stages. First, prior to the "setting" stage the concrete is more or less mobile, and requires some restraint to hold it in place. After it has "set" it no longer needs restraint, but time must elapse—the second stage or hardening period—before it reaches a stone-like quality.

In support of the contention of invalidity defendants cite the Lechler patent No. 337,134, the German publication, Zement, and the German publication, Die Betonstrasse.

This court does not feel at liberty to review the Lechler patent as the argument presented herein demonstrates no addition to the contentions made before the Circuit Court. See 3 Cir., 89 F.2d 960, 964, supra.

The German publication, Zement, not before the Circuit Court, will be considered here in the light of the following pertinent statement:

"The formation of shrinkage cracks is prevented through Inertol paint [stipulated to be a bituminous cut-back, a solution of asphalt in a solvent] in a natural manner like through the application of wet cloths. These, however, must be constantly wetted which causes in hot, dry weather much work, while Inertol paint coats applied with tar brushes in simple manner require no additional work. The smoothing effect produced by Inertol paint coats which would be impractical on concrete roads can be avoided by painting once with a diluted Inertol or when normal Inertol is used, by lightly spraying the fresh coat with fine sand. Then the pores of the concrete are filled but no smooth skin is produced.

"The application of Inertol on concrete is best done as soon as the concrete has somewhat dried on the surface."

It is contended that this quotation points out the application of the Lechler process to concrete roads, and, therefore, should be held to anticipate the Hayden patent. It is true that the Circuit Court distinguished the Lechler patent on the ground that it did not refer to its application on concrete roads. However, this court is not convinced that there is such a revelation in Zement as would anticipate the patent in suit. The application of Inertol with a paint brush would be impractical on a concrete highway. Indeed, the quotation recognizes this. Furthermore, the reference to the application of Inertol upon a surface "somewhat dried" suggests that the concrete is "set". Lastly, there is testimony to the effect that unset concrete has no pores that can be filled with another material such as sand. It follows that this article concerns the application of an evaporation-deterrent at a stage subsequent to the period contemplated by Hayden, that is, before "set", and is not anticipatory of the patent in suit.

The German publication, Die Betonstrasse, bears the date, November 1, 1927 as compared with October 12, 1925 the date of filing of the application which resulted in the patent in suit. Hence, this reference is not prior art and does not require any discussion in that connection.

Considerable emphasis is made of the fact that Hayden was not the first person to utilize a means to retard the evaporation of water prior to the setting stage of the concrete, and as proof of this fact, it is argued that it had been the practice to spread wet burlap bags on the surface of concrete while it was "unset". Without determining whether or not such was the custom this court is of the opinion that the argument is irrelevant. Even if such were the case the method of Hayden is utterly different, and would still constitute patentable novelty.

Aside from the references to the prior art, invalidity is asserted on the ground that Hayden has inserted new matter in his claims and specifications to such an extent that he has left the Patent Office with something entirely different from that which he took there in the original instance. As evidence of this fact it is urged that the original application contained no reference to the time at which the application of the emulsion was to be made, but that the patent as finally granted specifies that the application should be made prior to the setting of the concrete, the very crux of the plaintiff's case.

We are relieved of a consideration of this contention, because the same point was presented to and ignored by the Circuit Court. Barber Asphalt Company v. Stulz-Sickles Company, supra.

The material in support of invalidity presented herein falls within the following quotation taken from Lektophone Corporation v. Miller Bros. Co., D.C., 37 F.2d 580, 581:

"* * * The orderly administration of justice requires that matters decided by the Circuit Court of Appeals of any circuit have a binding effect upon all the District Courts in that circuit, notwithstanding contrary decisions in other circuits. Edison Electric Light Co. v. Bloomingdale (C.C.) 65 F. 212. Such matters include the validity and construction of letters patent, where the evidence pertinent to such issues are the same. * * *

"Consequently, without regard to the effect that should be given under the rules of comity by the courts of one circuit to a decision upon the same patent by the courts of another circuit (Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 20 S.Ct. 708, 44 L.Ed. 856; Rousso v. First Nat. Bank (D.C.) 19 F.(2d) 247), it is both clear and settled that, when a patent has been sustained and construed by the Circuit Court of Appeals of a circuit, a District Court of the same circuit subsequently dealing with the same patent, even in a suit between different parties, must first inquire whether the second record contains anything not before the appellate court. If it finds therein nothing new, the earlier decision of the appellate court must be accepted as controlling. If something new is discovered, the District Court must next inquire whether the new matter is of such character that it may be fairly supposed that the appellate court would have reached a different conclusion, had the new facts been before that court. It cannot be so supposed, unless the new matter is clear, substantial, and reasonably conclusive. Moreover, the controlling effect of the decision of the appellate court is not limited to the facts and defenses discussed in its opinion, but extends to all that were before it in the record. * * *"

It is to be observed that the only matter not presented to the Circuit Court is the German publication, Zement. This in itself is not so persuasive as to convince this court that the Circuit Court would have reached a different conclusion had the article been cited before it. Accordingly, we conclude that the patent is valid.

The next problem with which we are concerned is whether or not there has been an infringement of the plaintiff's patent.

The infringement charged here occurred in connection with the construction by La Fera Grecco Contracting Company of a concrete roadway on Mill Street in Belleville, New Jersey, and the parties have made the following stipulation pertinent to infringement: "9. That the defendant, La Fera Grecco Contracting Company, in July or September, 1938, and prior to the filing of the Complaint herein, constructed a concrete roadway on Mill Street, Belleville, New Jersey, in the construction of which an asphalt emulsion was sprayed on the surface of the concrete roadway."

Since the Hayden patent specifically provides for the application of emulsion prior to the setting of the concrete, it becomes necessary to determine if the evidence establishes that the defendant La Fera Grecco Contracting Company utilizes emulsion at a similar stage.

Duff Abrams, a consulting engineer in behalf of plaintiff, testified that he examined the Mill Street job on September 9, 1938. He stepped on the pavement at a point where the bituminous material had been applied. He said: "When I arrived the man who was engaged in the application of the bituminous film had just discontinued this particular section and I went up to the pavement, stepped on it at a point where the bituminous material had been applied. I found the concrete still unset, and as evidence of its condition I placed the tips of my fingers into the surface on top of the film. I placed my foot on the concrete surface and wiggled it forward and backward quickly and found that the concrete was unset to the extent that it was quite mobile under that slight pressure. I inserted a knife-blade into the surface to a depth of an inch or an inch and a half and found that the concrete was unset in that way. In other words, three tests were applied, each of which furnished conclusive evidence that the concrete was unset."

Gloster P. Hevenor, a civil engineer with considerable experience with concrete work, vice-president and general manager of the Johnson-March Corporation, testified that he observed the Mill Street job with Duff Abrams immediately after the concrete was sprayed with emulsion. He says:

"I stepped off the curb and put my foot on it, moved around. The concrete was quaky, that was on the part that had just been sprayed according to my observation.

"Then I used a pen knife and pushed it into it to see how easily it would be admitted and it went in very easily.

"The concrete was unset, plastic".

He concluded by stating there was no doubt in his mind that the concrete was unset. He testified that it was a "fairly stiff concrete mix, but it was not bonded at all", that the particles "were just held together by pressure, by their own weight".

Irving A. Pfeil, District Manager of the Thompson Materials Company, and ex-

perienced in the laying of concrete, testified that he was present at the Mill Street job with the above witnesses. He testified that he "stomped with his heel and foot into the concrete" after it had been sprayed, and found that it was soft and plastic. He also made a photograph of the concrete street which has been introduced into evidence. The picture discloses an air compression machine which weighs six or seven hundred pounds located approximately in the center of the street, and it is moved about on its wheels as the spraying proceeds. The wheels, however, do not contact the concrete surface, but roll upon plank lanes. The picture also reveals a man standing upon the planks with a spraying nozzle in his hands.

In conflict with the above statements we have the testimony of Joseph M. Napoliello, treasurer of the defendant La Fera Grecco Contracting Company, and in charge of construction and bidding, and the testimony of Tim Brisson whose picture is in evidence as the person who sprayed the emulsion at the Mill Street job. Napoliello testified that he would never spray emulsion on soft concrete, and made other statements indicating that the concrete on the Mill Street job was "set" at the time it was sprayed. Brisson testified that he walked on the concrete while he was spraying it, that he made no marks because he had waited for it to dry, and that he never sprayed until the concrete had become hard.

Much is made of the fact that the photograph discloses concrete supporting a compression machine and a man, and that this is proof that the concrete has set, for otherwise it could not support such a burden. This does not follow because concrete consists of gravel, crushed rock and sand which themselves may be capable of supporting such a weight. The photograph in no way reveals the bonding effect of the cement in the concrete composition, and for that reason it cannot be said that it speaks for itself. To determine if concrete has set a superficial examination will not suffice. Instead, one must dig beneath the surface and ascertain the inner texture of the composition.

The court does not encounter great difficulty in weighing the evidence adduced, and concludes that the evidence in favor of infringement preponderates. The testimony of Abrams, Hevenor and Pfeil,

who are experts on the subject, and whose testimony is based upon direct observation and tests, is persuasive. In conflict therewith we have the testimony of Napoliello and Brisson. Napoliello did not witness the spraying of the concrete on the Mill Street job, and, hence, has no personal knowledge of the actual condition of the concrete at the time it was sprayed. Therefore, his testimony can not rebut the positive statements of Abrams, Hevenor and Pfeil. Brisson only testified that the concrete was hard at the time he sprayed it. His qualifications do not compare with those who testified that the concrete was unset, and nowhere in his testimony does he refer to concrete which is set or unset.

We are constrained to the conclusion that the defendant La Fera Grecco Contracting Company has infringed the Hayden patent as alleged in the complaint.

The next and final issue is advanced in the counterclaims of the defendant La Fera Grecco Contracting Company, and the Intervenor, Stulz-Sickles Company, relating to the business practices of Barber Asphalt Corporation, Johnson-March Corporation and Thompson Materials Corporation, defendants on the counterclaims. It is alleged therein that the defendants to the counterclaims have conspired to stifle competition in the sale of bituminous asphalt emulsion, an unpatented material, thus, securing to themselves a monopoly in contravention of the laws of the United States.

Prior to 1938 the predecessor in name and interest of the plaintiff, Barber Asphalt Corporation, was the owner of both the legal and beneficial interest in the Hayden patent. It granted no express licenses, written or oral, to contractors who might wish to practice the method covered by the Hayden patent, and it did not seek to make road builders pay a royalty for employing the patented method. It did, however, adopt a method of doing business which was the practical equivalent of granting a written license with a condition that the patented method could be practiced only with emulsion purchased from it. In the Circuit Court of Appeals this method was held not to bar recovery for infringement in the case of Barber Asphalt Company v. Stulz-Sickles Company et al., supra. However, Leitch Manufacturing Company, one of the defendants in the latter case, appealed from

that decision to the United States Supreme Court whereupon recovery for contributory infringement was denied on the ground that this method of doing business was an effort to extend monopoly by the plaintiff to an unpatented material. Mr. Justice Brandeis, speaking for the Court, reiterated the rule declared in Carbice Corporation v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819, and applied it as follows: "* * * By the rule there declared every use of a patent as a means of obtaining a limited monopoly of unpatented material is prohibited. It applies whether the patent be for a machine, a product, or a process. It applies whatever the nature of the device by which the owner of the patent seeks to effect such unauthorized extension of the monopoly. Nothing in Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 325, 29 S.Ct. 503, 53 L.Ed. 816, limits it." Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 463, 58 S.Ct. 288, 290, 82 L.Ed. 371.

Following this decision the Barber Asphalt Corporation adopted a new method of doing business to overcome the prohibition of the above case, which method is presently attacked by the counterclaimants. The evidence discloses that on February 14, 1938 it entered into an agreement and license with the Johnson-March Corporation in which among other things the parties agreed as follows:

"4. It is agreed that Johnson-March shall pay to Barber, and Johnson-March agrees to pay to Barber as a license fee or royalty on account of use of the method patented in and by said United States Letters Patent No. 1,684,671, by it, by its sublicensees hereunder, and by licensees under any license assigned to it hereunder by Barber, a sum based on the extent of use of said method hereunder as measured by the number of gallons of material used in carrying out the patented method, and which sum shall be at the following rates per gallon of material used hereunder in practice of the patented method:

(a) In all territory of the United States west of the Mississippi River and in Alaska and Hawaii:
   (1a) where such material is not of the emulsion type........1¼ cts. per gallon.
   (2a) where such material is of the emulsion type..........2 cts. per gallon.
(b) In all remaining territory covered by said United States Letters Patent No. 1,684,671, regardless of the type of material used.......2 cts. per gallon.

"7. Johnson-March agrees that in operation under this license it will operate only by the actual practice of the method of said United States Letters Patent No. 1,684,671 by itself hereunder, or by others under sub-licenses from it based upon the payment of a monetary license fee or royalty to it on account of the use of the said invention; and Johnson-March further agrees that in all ways it will avoid so using said United States Letters Patent as to obtain any limited monopoly in unpatented material for practicing the method of said Letters Patent".

This contract contemplated that Johnson-March Corporation would pay the Barber Asphalt Corporation 2 cents for every gallon of emulsion used in the practice of the patent either by itself or any ·of its sub-licensees. The written agreement confirms this understanding beyond question when it provides in paragraph No. 5 as follows: "* * * and Johnson-March further agrees that it will furnish to Barber on or before the fifteenth day of January, April, July and October of each year during the life ·of this agreement and license, a statement, under oath, if requested, showing the names of the users of the said patented method hereunder and the places and the extent of use during the next preceding three calendar months, expressed in gallons of material used, and, at the same time, will make payment to Barber of the sum shown to be due thereby as license fees or royalty to Barber at the rate provided for herein."

On the 1st day of March, 1938, Johnson-March Corporation entered into an agency contract with Thompson Materials Corporation. Among other things the contract provided as follows:

"1. Johnson-March is the manufacturer or distributor of 'Hunt Process', 'Curcrete' and 'Ritecure'[2], concrete curing compounds, and controls the exclusive right to the practice of the method of United States Patent No. 1,684,671, under which it has granted and will grant licenses,

---

[2] These are tradenames for bituminous emulsions or solutions.

"2. Agent is a dealer and distributor of road construction materials, operating in the States of New York, New Jersey, Connecticut, Massachusetts, Maine, Vermont, New Hampshire and Rhode Island,

"3. Johnson-March hereby grants to the Agent the exclusive right to sell 'Hunt Process', 'Curcrete' and/or 'Ritecure' for use on highways and pavements and structures according to the method of United States Patent No. 1,684,671, only, however, within the limits of the above described states and only to licensees of Johnson-March under said letters patent,

"4. In consideration of having this exclusive sales area the Agent agrees to maintain, at his own expense, an adequate sales force for the promotion and sale of 'Hunt Process', 'Curcrete' and 'Ritecure',

"5. Johnson-March agrees to sell the Agent, and the Agent agrees to buy 'Hunt Process' in fifty (50) gallon drums, f. o. b. factory at Perth Amboy, New Jersey, exclusive of any sales tax at ...... Cents per gallon, and in tank trucks or tank cars, f. o. b. factory at Perth Amboy, New Jersey, exclusive of any sales tax at ...... Cents per gallon, during the year 1938.

\*   \*   \*   \*   \*   \*

"7. This agreement shall become effective immediately. It shall remain in full force until December 31st, 1938. The agreement may be renewed, at the option of the Agent for one (1) year, providing that the Agent shall show that he has sold at least fifty percent (50%) of all available curing contracts in his territory during the preceding year, as evidenced by the total contracts let during that period by the respective State Highway Department".

Inasmuch as Thompson Materials Corporation can sell bituminous emulsion only to licensees of Johnson-March Corporation under said letters patent, the following form of sales agreement was entered into between Thompson Materials Corporation and its customers:

"Whereas ——— hereinafter referred to as Contractor, is licensed by The Johnson-March Corporation under United States Patent No. 1,684,671 to cure certain concrete, included in a certain contract designated as ——— having approximately ——— sq. yds. surface, in consideration of the payment to Johnson-March Corporation of a royalty of one cent ($0.01) per yard on the basis of Engineer's Estimate; and

"Whereas contractor desires to purchase from Thompson Materials Corporation certain material known as Hunt Process [or] Ritecure for the curing of said concrete:

"Now, therefore, Thompson Materials Corporation agrees to furnish to Contractor and Contractor agrees to accept and pay for Hunt Process [or] Ritecure sufficient to cure above yardage at the price of ——— per gallon, plus any State, Federal, and/or City taxes imposed thereon f. o. b. refinery, Perth Amboy, New Jersey, for delivery to Contractor by ——— freight collect at ——— and Thompson Materials Corporation warrants that the price above fixed includes all royalty which shall be due on account of the curing of the said concrete under the said license and agrees to remit said royalty to Johnson-March Corporation and to save Contractor harmless on account.

"[etc.]"

It is apparent, then, that while Barber Asphalt Corporation divested itself of all rights except the bare legal title to the Hayden patent it still sold bituminous emulsions. As a matter of fact Johnson-March Corporation bought all of its emulsion from Barber Asphalt Corporation, and, of course, Thompson Materials Corporation bought all of its emulsion from Johnson-March Corporation, thus forming the middleman channel through which Barber Asphalt Corporation's emulsion flowed to the consumer-contractor.

In actual practice Johnson-March Corporation operated its exclusive license in the Hayden patent in two methods—(a) through the medium of the agency, Thompson Materials Corporation, when the contractors purchased emulsion at a price inclusive of royalty, or (b) by issuing licenses to contractors who did not purchase emulsion through Thompson Materials Corporation. In the latter case the licenses issued to the contractors provided for the use of the Hayden patent upon the payment to Johnson-March Corporation of 1 cent for each square yard covered by bituminous emulsion.

In order to publish its alleged desire to conform to the opinion of the Supreme Court in the case of Leitch Mfg. Co. v. Barber Co., Inc., supra, the Johnson-March Corporation caused items to be published in Contractors and Engineers

Monthly for July, 1938, and in the American City for August, 1938, trade journals, of the following tenor:

"The method of curing concrete by the use of bituminous or other impervious membrane is now controlled exclusively by the Johnson-March Corp., 52 Vanderbilt Ave., New York City. Heretofore, this company marketed only the Hunt Process and Ritecure under license from the Barber Asphalt Corp., which sold Curcrete for the same purpose. Now, by arrangement with the Barber Asphalt Corp., Johnson-March's license includes all the rights under U. S. Patent No. 1,684,671. This patent, which has been under litigation, was recently validated by the U. S. Supreme Court.

"In order to promote unrestricted and fully competitive bidding on this curing method, the Johnson-March Corp. offers to license anyone to it, with any kind of asphalt cut-back or emulsion, upon payment of a moderate royalty, or, if contractors so elect, they can purchase Hunt Process, Ritecure or Curcrete, all products designed for this special process, at a price which includes the royalty for the use of the process.

"Bituminous or impervious membrane curing consists of the spraying of a bituminous cut-back, emulsion or colorless compound on concrete immediately after it has been placed and finished. This compound forms a film which gives certain protection to the concrete, not only during the critical first day, but until the slab is fully hardened and put into use. The bituminous coating on highways, by darkening the surface, is claimed to kill the glare, and also to eliminate the unsightly oil and carbon stains in the traffic lanes.

"The results of extensive investigation of this method of curing are published in a booklet which may be secured by interested contractors and engineers direct from the Johnson-March Corp.

&ast; &ast; &ast; &ast; &ast; &ast;

"In order to promote unrestricted, free and fully competitive bidding on this curing method, the Johnson-March Corporation offers to license anyone to use it, with any kind of asphalt cut-back or emulsion, upon notification of such intention and payment of a moderate royalty; or, if city officials or contractors so desire, they can purchase Hunt Process, Ritecure or Curcrete, all products designed for this special process, at a price which includes the royalty for the use of the process, and a license under the patent."

It also posted public notices of the alternate methods by which the patent could be practiced in the highway departments of a number of states.

The testimony disclosed that there were some contractors who chose to purchase their emulsion elsewhere and pay the cent a square yard license fee. One of these was the firm of George M. Brewster & Sons, a copy of whose license was offered in evidence. It provided in part as follows:

"1. Johnson-March hereby grants to Brewster a non-exclusive right and license to practice the Method of Preventing Evaporation from Concrete During Curing under and in accordance with United States Letters Patent No. 1,684,671, for and during the remainder of the term of said United States Letters Patent.

"2. Brewster agrees to pay to Johnson-March as a royalty or license fee the sum of One Cent ($.01) per square yard of concrete hereunder cured by it according to the method of said United States Letters Patent No. 1,684,671 and agrees to make payment to Johnson-March of said license or royalty in connection with each job involving the curing of concrete by it hereunder within Fifteen (15) days after the job is accepted by State Highway authority, or other awarding authority, on the basis of engineer's final estimate of yardage, or on the basis of measurement if there be no engineer's final estimate."

There was, then, here a transition in the method of calculating the royalty to be paid for the use of the Hayden patent that was not contemplated in the original agreement of license between Barber Asphalt Corporation and Johnson-March Corporation. In that agreement the royalty was to be based upon a per gallon basis. By the licensing arrangement of Johnson-March Corporation with contractors who did not use emulsion bought from Thompson Materials Corporation the calculation of royalty was upon a basis of each square yard of paving covered by the emulsion.

This transition, the counterclaimants allege constitutes the crux of defendants' scheme to circumvent the position of the United States Supreme Court in the case

of Leitch Mfg. Co. v. Barber Co., supra, and the laws of the United States interdicting monopolistic practice.

The counterclaimants urge that the expedient of the square yard royalty or license basis was devised because it is impossible to calculate in advance how many square yards of paving can be covered by the emulsion. Various estimates were made in the case running from six or seven to eighteen square yards. They say that the contractor is faced with this proposition—Thompson Materials Corporation offers emulsion at 24 cents per gallon including the license fee to practice the patent over any number of square yards. Stulz-Sickles Company offers emulsion at 15 cents per gallon, but the contractor must pay a license fee of 1 cent a square yard to use this emulsion in practicing the patent. If by his industry he is enabled to spread the emulsion over as many as eighteen square yards it has cost him 33 cents for the gallon, and it would have been to his advantage to make his purchase from Thompson Materials Corporation whereby he would receive his license for the price of a gallon of emulsion. Thus, say the counterclaimants, a Hobson's choice is presented to the contractor who naturally desires to play safe and make his purchase from Thompson-Materials Corporation, and thereby the monopoly of the Barber Asphalt Corporation in its sale of emulsion is vouchsafed.

The proofs show that Johnson-March Corporation paid to Barber Asphalt Corporation the following sums as royalties under its exclusive license during the five quarter annual periods from January of 1938 to April of 1939:

| | |
|---|---|
| January to April, 1938 | $ 166.12 |
| April to July, 1938 | 2,537.94 |
| July to October, 1938 | 2,014.04 |
| October to January, 1939 | 434.64 |
| January to April, 1939 | 121.72 |
| | $5,274.46 |

It also appears that some contractors refused the bait cast by the Thompson Materials Corporation and chose to pay a cent per square yard of coverage under the patent with emulsion purchased elsewhere because the following contractors were shown to have remitted to Johnson-March Corporation the sums set opposite their names:

| | |
|---|---|
| George M. Brewster & Son, Inc., February 9, 1939 | $ 313.65 |
| Elis G. De Lia & Co., October 31, 1938 | 365.48 |
| Maple City Lumber & Supply Co., October 5, 1938 | 614.29 |
| Coleman Bros. Corp., October 7, 1938 | 77.00 |
| | $1,370.42 |

The counterclaimants urge that the expedient of the square yard royalty basis was devised because of the impossibility to calculate in advance how many yards could be covered by a gallon of emulsion, and that because of this vagueness contractors would be forced to purchase emulsion at a price inclusive of royalty, thus, maintaining the sale of Barber Asphalt Corporation's emulsion through the medium of the agency of the Thompson Materials Corporation.

The court concedes that the transition of royalty calculation from a per gallon basis to a square yard basis is mysterious and unexplained. But suspicion is not sufficient to establish the monopolistic practice claimed by the counterclaimants. The fact remains that George M. Brewster & Son, Inc., and others purchased emulsion elsewhere than from Thompson Materials Corporation and paid a license fee based upon a square yard which the emulsion covered. The amounts of emulsion used in the process and purchased from competitors of Thompson Materials Corporation and so through Johnson-March Corporation from Barber Asphalt Corporation may be insignificant as compared with the emulsion used in the process and purchased from Thompson Materials Corporation. It is regrettable that we do not know what the proportion is. Without it we are unable to determine to what degree, if any, plaintiff has extended the protection of its patent to monopolize unpatented materials. Consequently, this court cannot conclude that contractors are coerced into buying emulsion from Johnson-March Corporation by virtue of its method of doing business, and that a monopoly exists. The relief prayed for in the counterclaims is denied.

A decree may be made in accordance with the views herein expressed.