## INSULITE CO. v. RESERVE SUPPLY CO.
### No. 9454.

Circuit Court of Appeals, Eighth Circuit.

July 26, 1932.

434

A. C. Paul, of Minneapolis, Minn. (Paul, Paul & Moore, of Minneapolis, Minn., on the brief), for appellant.

Henry M. Huxley, of Chicago, Ill. (Kellogg, Morgan, Chase, Carter & Headley and Guy Chase, all of St. Paul, Minn., and Edward A. Hampson, of Chicago, Ill., on the brief), for appellee.

Before GARDNER and BOOTH, Circuit Judges, and NORDBYE, District Judge.

GARDNER, Circuit Judge.

Appellant brought this suit against the appellee for infringement of patent No. 1,-725,787 issued to George H. Ellis August 27, 1929. For convenience the parties will be referred to as they appeared in the lower court.

The bill of complaint is in conventional form, alleging the issuance of the patent, its assignment to the plaintiff, the acts of infringement by the defendant to plaintiff's damage, and the prayer for permanent injunction and for an accounting. The answer of defendant denies the validity of the Ellis patent for lack of invention in view of the prior art; challenges the validity of claims 6 to 16 as not being supported by the disclosure of the original application; and alleges that these claims were not made until more than two years after the filing of the original Ellis application, and that in the meantime the Hanson patent, No. 1,651,951, had issued and the defendant's products had been produced and put upon the market before these claims 6 to 16 had by amendment been included in the Ellis application as originally filed.

The objects of the Ellis patent are stated in the specifications as follows:

"One object of the invention is to provide wall boards adapted to be used in the construction of either outer or inner walls, that will not warp or buckle when wet plaster cement or stucco is applied thereto.

"Another object of the invention is to provide a wall constructed from board that will permit longitudinal expansion of the boards, without causing the same to bulge or warp."

There are as finally allowed sixteen claims in the patent. The first four of these are substantially as they were in the original application. No. 5 is not in dispute in this suit. Claims 6 to 10 were inserted May 25, 1928, and claims 11 to 16 were inserted May 16, 1929, and patent issued August 27, 1929.

The product manufactured by plaintiff under the patent in suit is known to the trade as "Insulite," and is a composition fiber board made of wood fiber. The product sold by the defendant is known to the trade as "Celotex," and is a composition fiber board made of bagasse or sugar cane fiber. Both these products are used as a substitute for lath, and for insulation. The Reserve Supply Company is a seller, rather than a manufacturer, of the Celotex product; the product being manufactured by the Celotex Company.

The lower court found the issues in favor of defendant, holding that the Ellis patent was invalid as involving no invention over the prior art; that as to claims 6 to 16, inclusive, of plaintiff's patent such claims were not supported by the disclosure of Ellis' original application as filed; that if valid it was so limited that the defendant was not guilty of its infringement; and therefore dismissed plaintiff's bill of complaint. From this decree of dismissal plaintiff has appealed.

We shall first consider the contention of plaintiff that the court was in error in holding, as it did, that claims 6 to 16 were not supported by the disclosure of the original Ellis application. If this holding of the court was correct we need give no further consideration to these claims. Claims 7 and 14 may be taken as typical in so far as these claims assert claims not included in the application as originally filed. They read as follows:

"7. In combination with a support slabs of fibre material secured to the support with each slab marginally overlapping the adjacent slab, the overlapping portions of said slabs being reduced in thickness to reduce the area of end-abutment and weaken said slabs in the overlapping region, said slabs being formed to provide a depression lying

in opposition to the overlapping area, so that when plaster is applied it will be thicker in the region of the joint."

"14. A plaster base comprising a series of panels adapted to be arranged adjacent to each other in the same plane and having roughened outer surfaces for holding a sheet of plaster applied to the base, each of said panels being provided at two opposite edges with reversely arranged reduced edge portions adapted to complement similar edge portions of other panels adjoining said edges, said complementing edge portions being of different widths whereby channels will remain for the forming of reenforcing ridges in the sheet of plaster applied to the base."

All that was disclosed in the original application so far as it related to the longitudinal joint was a narrow groove specifically marked on the drawing as being one-sixteenth of an inch wide. The purpose of the groove as specifically stated in the application was confined to expansion purposes. It disclosed no purpose of re-enforcing the plaster by providing a groove, this element not being claimed until March 16, 1929. The disclosure of the original application was limited to the purpose of overcoming warping and buckling of the fiber board. The means of accomplishing this purpose was by cutting out a portion of the board at either edge, making one of the tongues so formed longer than the other, so that when the edges of the two boards were placed together there would be a slight groove by reason of the fact of the inequality of the length of the two tongues.

Hans E. Hanson during 1923 and 1924 made samples of fiber board laths, each board having tongues on all four edges, the tongues on opposite edges of the board being of different width so that on assembling, the joint between adjacent boards was shiplapped or rabbeted with a relatively wide rectangular groove at the end of the shorter tongue, the joint thus made between adjacent edges resulting in full size recess or groove at the joint. While the Ellis application was pending, Hanson applied for patent; and claims 11 to 16 of the Ellis patent were copied substantially from the Hanson patent and were inserted May 16, 1929, while claims 6 to 10 were inserted in the Ellis application May 25, 1928. Letters patent No. 1,651,951 issued to Hanson December 6, 1927, and reissued June 26, 1928, as No. 17,007, prior to the time that Ellis filed a renewal of his original application in which he attempted to change his specifications.

We are clearly of the view that claims 6 to 16 of the Ellis patent are not disclosed in the application as originally filed. As originally filed, two objects were disclosed. One was to prevent warping and buckling; and the other allowed for longitudinal expansion. While it is permissible during the prosecution of an application for patent, to make amendments to the specifications and claims, yet these amendments must be directed to the same invention as originally disclosed, rather than to new matter. Obviously, a patentee should not be permitted, by filing an application for patent, to pre-empt the right to all conceivable inventions relative to the same general subject-matter. Chicago & N. W. Railway Company v. Sayles, 97 U. S. 554, 563, 24 L. Ed. 1053; Lopulco Systems v. Bonnot Co. (C. C. A.) 24 F.(2d) 510; Powers-Kennedy Contracting Corp. v. Concrete Mixing & Conveying Co., 282 U. S. 175, 51 S. Ct. 95, 99, 75 L. Ed. 278; Dwight & Lloyd Sintering Co. v. Greenawalt (C. C. A.) 27 F.(2d) 823; Diamond Power Specialty Corp. v. Bayer Co. (C. C. A.)13 F.(2d) 337; Box Patents v. Universal Paper Box Mfg. Co. (C. C. A.) 57 F.(2d) 66.

In Chicago & N. W. Railway Company v. Sayles, supra, it is said: "Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has, in the meantime, gone into public use."

In Lopulco Systems v. Bonnot Co., supra, the court said: "The duty of careful scrutiny in such cases was referred to by this court in Hestonville v. McDuffee (C. C. A.) 185 F. 798, 802, where it was said: 'when, therefore, a patentee, seven years after his original application'—in the instant case two years— 'and enlightened by such intervening years of progress, seeks not to prosecute his original application, but to amend the same, and on the basis of such amendment to make claims of a different character from those originally made, it becomes the duty of a court to zealously and jealously scrutinize such belated application.'"

What is said by the Supreme Court in Powers-Kennedy Contracting Corporation v. Concrete Mixing & Conveying Co., supra, is here apposite. It is there said inter alia: "And, even if the mode of operation is as claimed, it is to be remembered that Leake in his application of October 7, 1907, uses the

same words to describe the operation of his nozzles as we find McMichael subsequently inserted in his specifications and claims. When this application came into interference with McMichael's, he, of course, became familiar with Leake's claims. It is significant that he then amended his claims, almost in the very words of Leake. This of itself destroys the patent."

Plaintiff contends, however, that Ellis has reserved to himself the strengthening rib invention because there was inserted in the original application the words, "I do not limit myself to the details of construction nor to any particular dimensions of the composition boards, or of the tongues formed on the edges thereof." These words, however, gave no intimation that Ellis intended to claim that his invention covered the strengthening rib. They simply permitted him to change the dimensions shown in his drawings, but without changing the functions of the device disclosed in the specifications. We are therefore of the view that no rights can be asserted under claims 6 to 16 of the Ellis patent.

■ These claims 6 to 16 of the Ellis patent are subject to the further objection that they were not made until more than two years after the filing date of the original application. Two years and five months intervened between the date of the filing of the original application and the making of the renewal application on January 30, 1928, in which, for the first time, the subject-matter of these claims was disclosed. The substance of these claims was disclosed in the claims of the Hanson patent which issued December 6, 1927, two years and four months after Ellis' original filing date; and the Celotex type of joint had begun to be shipped and went into use as early as September 26, 1927, two years and one month after the filing date of the original Ellis application.

In Hartford-Empire Co. v. Obear-Nester Glass Co., 39 F.(2d) 769, 776, this court, after holding that the applicant might, pending the prosecution of an application, amend his claims, if within the original application, at any time within two years after filing the original application, said: "But if a patent, which makes claim to the subject-matter present and disclosed in the application of the original applicant, but not claimed by the latter, shall have been issued to a stranger more than two years after the original applicant files his original application, the latter can thereafter neither amend his original claims (so as to broaden them) nor file a divisional application, embracing claims, so after two years patented to a stranger."

See, also, Kansas City Southern Ry. Co. v. Silica Products Co. (C. C. A.) 48 F.(2d) 503.

Ellis therefore had no right to claim elements not disclosed in his original application, by renewal application filed two years and five months after the filing of his original application when, prior to the filing of such renewal, the Hanson patent had issued and the Celotex lath had gone into public use.

■ We shall, therefore, pass without consideration on the merits all contentions bottomed on claims 6 to 16, inclusive, of the Ellis patent, leaving for consideration on the merits only claims 1 to 4, inclusive.

This group of claims deals primarily with the board itself and its longitudinal edge construction making no reference to the groove formed for the reception of plaster. They provide for a composition fiber board with shiplapped or rabbeted edges, one tongue being longer than the other. Claim 4, designated by plaintiff as typical of this group, is as follows: "4. As a new article of manufacture, a composition fibre board having opposite longitudinal edges corner notched in opposite parallel edges to provide lap projections, the lap projection at one longitudinal edge being of greater depth transversely of the board than that of the other longitudinal edge, respective projections being formed by corner notching in opposite directions inwardly from opposite face sides of the board."

As has already been observed, one of these lap projections is longer or deeper than the other. Each lap projection is made by cutting a right-angled recess in the edge of each of the adjacent boards, so that if expansion takes place on moistening the surface containing the narrow groove formed by the unequal length of the two tongues, the shorter tongue, by expansion, approaches the opposite wall and tends to close up the groove.

In our view of the record, it is not necessary to go into the defendant's construction bcause we think these claims, in view of the prior art, fail to disclose novelty or invention.

The form of the longitudinal joint in the Ellis device is shown in Encyclopedia Britannica (1911 Edition) vol. 15, at page 477. The rabbeted joint there illustrated shows one tongue longer than the other. The device of a groove in the bottom of a board for the specific purpose of preventing warping is

shown in the Reed patent, No. 168,672. In the Riley manual, at page 269, is illustrated a weather boarding as applied to the outside of a house, showing one tongue or the rabbeted joint longer than the other. Similar joints are found in the Sword patent, No. 467,063; the Gemmer patent, No. 576,569; the Piver patent, No. 624,862; the Australian patent, No. 2370; the Aycock patent, No. 1,202,770; and the Cooper patent, No. 1,496,368. True, these patents relate particularly to wooden joints, but they disclose the feature of having one tongue longer than the other to provide for expansion.

Rabbeted joints in material to which plaster or other material is applied are found in the Jones patent, No. 886,813. In this patent the composition is made up of plaster of paris, cement, or other like substance, combined with hair, wood fiber, sawdust, wool, wood shavings, excelsior, straw, or similar substances. The length of the lath covers three joists instead of four. The boards are arranged in staggered relation to each other and the joints are shiplapped. The specification states that after the boards or blocks are placed in position they may be covered with wallpaper or other similar material, which, of course, would include plaster.

In the Shamiah patent, No. 914,317, the laths are shown as staggered and applied to the vertical joists. The ends of the boards are slightly spaced from each other. The boards themselves are made of porous composition so that nails may penetrate, and so that the surface is adapted to take up wall plaster to insure a firm bond between the plaster and the boards in smooth-finishing the wall and closing the joints between the boards and bonding them together.

Rabbeted joints in material to which plaster or similar material is applied are found in the Dryden patent, No. 915,570, and the Kammerer patent, No. 979,310. Such joints showing a space for penetration of the plaster are shown in the Burris patent, No. 346,638; the Liefer patent, No. 389,090; the Norcross patent, No. 526,730; the Swiss patent, No. 18,589; and the Wightman patent, No. 1,503,931. All of these patents long antedate the Ellis patent.

It is true that none of these devices disclosed by the patents mentioned are composed of fiber board. But the use of Celotex and Insulite as a plaster board was well known long before the issuance of the Ellis patent. Ellis, from a practical standpoint, made the boards smaller, provided the longitudinal edges with shiplapped, rabbeted joints, and arranged the boards in staggered relation. All of this is shown in such patents as the Jones and the Kammerer patents. It is immaterial whether the plaster base is made of fiber board, of bagasse or sugar cane fiber, or of cork, or of any other material subject to expansion and contraction. There is no invention in the mere substitution of one material for another. Tyler Co. v. Ludlow-Saylor Wire Co. (C. C. A.) 254 F. 436; Hotchkiss v. Greenwood, 11 How. 248, 13 L. Ed. 683; Atlantic Works v. Brady, 107 U. S. 192, 2 S. Ct. 225, 27 L. Ed. 438.

In the light of the prior art, we are of the view that there was no invention disclosed by claims 1 to 4 of the Ellis patent. They were not the product of invention, but rather of mechanical skill.

The judgment appealed from is therefore affirmed.