## BARBER ASPHALT CO. v. STULZ-SICKLES CO. et al.

District Court, D. New Jersey.
March 21, 1936.

Pitney, Hardin & Skinner, of Newark, N. J., and Donald B. Kipp, and George J. Harding, of Philadelphia, Pa., for plaintiff.

Osborne, Cornish & Scheck, of Newark, N. J., and Samuel Ostrolenk, of New York City, for defendants.

CLARK, District Judge.

This is a dispute between two manufacturers of bituminous (asphalt) emulsion (the Barber Asphalt Company and the Leitch Manufacturing Company, Inc.). Joined as a defendant is the jobber (Stulz-Sickles Company), who sold the product to the ultimate consumer, a road contractor (Standard Bithulithic Company). The plaintiff company had more foresight than the defendant company. It acquired a patent (to Hayden, No. 1,684,671) covering a process for the treatment of a road concrete with the said bituminous emulsion. It will thus be noticed that we are being asked to enjoin a so-called contributory infringement. Walker on Patents, § 434, p. 526.

At the time of the trial and argument, it was suggested that the actions of the defendants did not bring them within the scope of this somewhat obscure doctrine. We were told that the last word in the Supreme Court did not permit the restraint of the sale of unpatented materials for use in a patented process. Carbice Corporation v. American Patents Development Corporation, 283 U.S. 27, 51 S.Ct. 334, 75 L. Ed. 819. There is a sentence in the opinion of the learned justice who spoke for the court in that case which bears that interpretation. It reads: "The owner of a patent for a process might secure a partial monopoly on the unpatented material employed in it." 283 U.S. 27, at page 32, 51 S.Ct. 334, 335, 75 L.Ed. 819.

That the matter is not free from doubt is well indicated by the varying opinions of the three very able judges who passed upon the question in the above-named case. American Patents Development Corporation v. Carbice Corporation of America (D.C.) 25 F.(2d) 730; Id. (C.C.A.) 38 F. (2d) 62.

It had been our impression that the logic of the rule of contributory infringe-

ment required the inclusion of the sale of unpatented substances or supplies. That logic is apparently the recognition of motive as an element in the tort of infringement of a patent right. Roberts, Contributory Infringement of Patent Rights, 12 H.L.Rev. 35. The strange inconsistency in the reported decisions in the law of torts generally is well known. Ames, How Far an Act May be a Tort Because of the Wrongful Motive of the Actor, 18 H.L. Rev. 411. The rule of the civil law is more satisfactory. A French writer, Larombiere, with the flair for accurate intellectual expression for which the thinkers of that nation are famous, has thus phrased it: "In order that the exercise of a right should guarantee entire and perfect freedom from liability, it is necessary that the person who exercises it should make a prudent use thereof, with ordinary precautions, without abusing it, and without exceeding its just limits. Any abuse which he should make of it which causes damage would render him liable to repair the damage so caused." And see Josserand, L.; De l'Abus des Droits (Paris) 1905; Charmont, article in Rev.Trim.1902, p. 113, and Obligations (Ed. of 1885) art. 1382, note II, vol. 7, p. 544, and cf. Toullier, vol. 2, note 119.

The English courts have been indifferent to the intent of the infringer and have apparently repudiated any doctrine of contributory infringement. We quote from Sir George Jessel, the famous Master of the Rolls, in the case of Townsend v. Haworth, reported in a note to Sykes v. Howarth, English Law Reports, 12 Chancery Division, 826, at page 831:

"The chief of these chemical substances are substances which are perfectly well known, and most of them are common substances; they are all old chemical compounds, and there is no claim in the patent at all except for the peculiar use of these chemical compounds for the purpose of preserving the cloth from mildew. No Judge has ever said that the vendor of an ordinary ingredient does a wrong if the purchaser coming to him says, 'I want your compound, because I want to preserve my cloth from mildew. I wish to try the question with the patentee.' No one would doubt that that sale would be perfectly legal."

"You cannot make out the proposition that any person selling any article, either organic or inorganic, either produced by nature or produced by art, which could in any way be used in the making of a patented article can be sued as an infringer, because he knows that the purchaser intends to make use of it for that purpose."
and from L. J. Mellish, affirming in the same case in 48 L.J.(Ch.) 773, note: "I am of the same opinion. I think it is quite clear that at law the defendant would be entitled to a verdict on a plea of not guilty. Selling materials for the purpose of infringing a patent to the man who is going to infringe it, even although the party who sells it knows that he is going to infringe it and indemnifies him, does not by itself make the person who so sells an infringer. He must be a party with the man who so infringes, and actually infringe."

And in the United States the idea seems to have been accepted grudgingly rather than logically. Carbice Corporation v. American Patents Development Corporation, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819, supra; Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959; Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co., 152 U.S. 425, 14 S.Ct. 627, 38 L.Ed. 500. As by definition we are dealing with intent and not action, it is difficult to perceive how we are concerned with the patented or unpatented character of that action or with such qualities as indicated by the adjectives "perishable," "consumable," "essential," "necessary," and "dynamic."

Reflection has led us to the conclusion that the manifest disinclination of the Supreme Court to broaden injunctive relief in cases of contributory infringement may be due to the equitable doctrine of balance of convenience. We have spoken before of the proneness of American judges to use, or rather abuse, their injunctive power. We have seen it in labor cases, and we have seen it in the removal of constitutional questions from state courts. The automatic trial of patent cases by the same method is apparently due to a distrust of juries rather than to any thorough analysis of the adequacy of the remedy at law. This tendency has become more marked of late years. We find in the earlier reports many instances of the jury's consideration of the question of fact of invention. Market Street Cable Railway Co. v. Rowley, 155 U.S. 621, 15 S.Ct. 224, 39 L.Ed. 284; Overweight Counterbalance Elevator Co. v. Improved Order of Red Men's Hall Ass'n

of San Francisco (C.C.A.) 94 F. 155; Plastic Fireproof Construction Co. v. City and County of San Francisco (C.C.) 97 F. 620. We think that twelve average and ordinary men are especially qualified to appraise the qualities of the average mechanic or inventor.

An able statement of the argument for the exercise of equitable jurisdiction is found in the above-cited article by Mr. Roberts, that very learned writer on patent law: "The question has been asked, and probably has been urged by the defendant in every case of contributory infringement, whether a perilous precedent was not being established which might lead in conceivable instances to an unjust embarrassment of a manufacturer or seller of articles innocent in themselves, which, nevertheless, had become actual instruments of wrong in the hands of others. There is always, nominally at least, a clear remedy for the patentee by suit against the immediate infringers whose acts are punishable by injunction, whether or not any actual intent to infringe existed. In many cases, however, such a remedy is wholly inadequate. A manufacturer who distributes thousands of infringing machines is the only defendant against whom the patentee can obtain real relief; for as against the purchaser and user a suit in equity could not reimburse the patentee for the unavoidable expenses of his suit; the courts recognize the existence of this state of things, and in cases of contributory infringement assist the patentee, so far as possible and proper, in his attempt to stop the trespass at its origin rather than compel him to take a course which practically opposes an impossibility to his effort toward establishing or enforcing his right." Pages 39, 40.

The opposite point of view is summarized by L. J. Vaughan Williams of the English Court of Appeals in the case of Dunlop Pneumatic Tyre Company, Ltd., v. David Moseley & Sons, Ltd., English Law Reports, 1 Chancery Division, 612, at page 619: "But I should like to add that I cannot conceive that the practical result of our judgment will be to inflict any injury upon the plaintiffs. If the parts manufactured and sold by Messrs. Moseley are eventually used for the purpose of making the patented tyres, and thus infringing the plaintiffs' patents, the plaintiffs will have full opportunity of suing those persons who thus infringe their patents, and the fact that the plaintiffs were not able to sue the present defendants for selling some article which might or must be intended for use in making the plaintiffs' tyres would not, in my judgment, practically deprive the plaintiffs of the power to enforce any rights and privileges to which they are entitled as patentees."

Mr. Roberts, from whom we have just quoted, has foreseen the inconvenience in the rule he advocates, for we find him saying at page 44: "In its enforcement, this rule will be guarded by such terms of application as will prevent it from embarrassing the person enjoined in the performance of the acts in question when properly dissociated from any wrongful intent."

It is because of the difficulty of "properly dissociating" the act and the intent "by the terms of the application" that we think the balance is against the exercise of equitable jurisdiction. A broad injunction contains the threat of numerous prosecutions for contempt against the manufacturer or supplier of the unpatented materials. It places in the hands of the patentee, therefore, a weapon for forging the partial monopoly of unpatented materials objected to by Mr. Justice Brandeis in the Carbice Case, supra.

Fortunately, perhaps, we are not constrained to an accurate forecast of the ultimate law of contributory infringement. This, because in our opinion the Hayden patent is completely anticipated by the German patent to Lechler, No. 337,134. As the "refrigerating" patent in the Carbice Case was described by Justice Brandeis as one of space (his words were "locational arrangement," 283 U.S. 420, at page 421, 51 S.Ct. 496, 75 L.Ed. 1153), we might describe the process in suit as one of time. The revolutionary invention of concrete depends, as we understand it, upon the recognition of the chemical reactions of certain inorganic substances, cf. sand, cement, gravel and water. Principles of Reinforced Concrete Construction, Turneaure and Maurer, c. 2; Manual of Reinforced Concrete and Concrete Block Construction, Marsh and Dunn, part 1. This process is known as hydration, and by hypothesis calls for some means of preventing evaporation. According to both the patentee's specification and the fact, the earliest method of avoiding the loss of water was the simple one of adding more water by the clumsy use of water-soaked burlap bags, dikes, sprinkling, etc. Evaporation (the conversion into a gaseous state) is caused by con-

tact with the air. Some might, although the defendant did not, question the genius involved in sealing or air tighting the concrete mixture at any time. Both the patent and the fact indicate that this was done by the very type of emulsion whose use is now sought to be restrained.

According to the patent, and apparently according to the fact, this sealing or air tighting did not take place immediately after the mixture was finished or poured, although exactly when it did take place seems uncertain. For the purposes of the case at bar, it is sufficient to say that, according to both the specification and the claims of the patent in suit, the application of a bituminous emulsion is prior in time to that indicated by the teaching of the prior art.

The patent in its specification and claims uses four time-fixing adverbial phrases. We set them forth in their context:

"Preferably, the film is applied as soon as practical after the cement or concrete is laid and finished; however it must be applied before the concrete has set, * * * if the benefits of my invention are to be obtained." Lines 72–77, p. 1.

"A bituminous paint. * * * Such a paint when applied, * * * as soon as practical after pouring and finishing of the concrete, but in any event before the concrete has set, will form a satisfactory protective impervious film. * * *" Lines 92–104, p. 1.

"To the surface of wet unset concrete and preferably as soon as practical after laying and finishing, I apply, as by means of a spray, a water-external-phase bituminous emulsion such as is often called in paving practice 'cold repair cement.'" Lines 6–12, p. 2.

"I have found that cement concrete which has thus been protected by the application thereto, when freshly placed, or before it has set, of a water impervious and preferably adherent film possesses a remarkably higher tensile strength after curing or aging than is possessed by the same concrete not so treated, and the occurrence of hair cracks is avoided." Lines 18–26, p. 2.

"3. The method of preventing evaporation of water from the surface of a freshly laid cement concrete roadway which consists in spraying upon such surface, as soon as feasible after it is laid and before it has cured, a continuous bituminous film." Lines 84–89, p. 2.

"4. The method of preventing evaporation of water from the surface of a freshly laid concrete roadway which includes spraying upon such surface before the concrete has set, a bituminous emulsion for the formation of an adherent water impervious bituminous film thereon." Lines 90–96, p. 2.

"* * * But with my new method the curing proceeds without interruption to completion. This is of particular advantage in road construction as construction traffic may be directed over the new concrete after say one week without interrupting the curing of same." Lines 45–51, p. 2.

It will be observed that all these adverbial phrases are general rather than specific, and in only one of them is any definite period of time mentioned. In other words, we are not told after what lapse of time cement or concrete is freshly laid, after what lapse of time it is feasible or practical to spray it with emulsion, or at what time it has set. We can only infer that it must be within the first week of its life. An attempt was made at the trial to give a trade meaning, so to speak, to the phrase "before the concrete has set." There was testimony by experts, from both sides, as a matter of fact, describing the chemical reactions of cement and water from which we deduce the process is divided into two parts (not three like Gaul). The first of which is the hydrating of the calcium oxide into calcium hydrate and the second is the formation of silica. Testimony, Abrams, p. 81; Howard, p. 222. The experts refer to the first reaction as setting and to the second as hardening. Their views were to some extent substantiated by the German technical book introduced in evidence (Handbuch der Steinkonstruktionen, Professor Otto Frick), wherein the learned author states: "From the setting is to be distinguished the hardening of the cement, which begins 4 to 8 hours after the mixing and lasts for decades." Page 352.

The patentee seems, however, to have disclaimed any such technical interpretation of the phrase because he has supplied us with an empirical one of his own. The specification and claims define this test as follows:

"* * * Until the concrete has set, or attained a rigidity such as to withstand

a substantial weight without marring, after which the burlap is removed and the surface covered with earth, or straw, which is maintained wet until the expiration of the stipulated curing period, when, the earth, or straw, is removed." Lines 17–24, p. 1.

"Another method, which has been attempted, involves the spreading of tar on the surface of concrete after the concrete has set, or attained a rigidity such as to enable workmen to walk on it without marring the surface." Lines 24–29, p. 1.

"I have discovered that if cement or cement concrete be treated, after it is finished, i. e., smoothed off, or broomed if so finished, and before it has set, i. e., before it will support a substantial weight, such as that of a man walking on it, without marring, * * * the concrete will cure without hair cracking. * * *" Lines 47–58, p. 1.

" * * * Before it has set, by which, as has been indicated, I mean before the concrete has attained a condition of firmness or rigidity such that it will support a substantial weight, without marring of the surface, as for example, the weight of a man walking on it." Lines 66–72, p. 1.

This is an entirely different standard from that of the American Society for Testing Materials (Treatise on Concrete, Plain and Reinforced, F. W. Taylor, M. E. and S. E. Thompson, S.B., (1906) p. 30), which is made to depend upon the penetration of the mixture by two different sized Gilmore needles. That interesting work further subdivides the setting process into an initial set occurring in not less than thirty minutes and a hard set in not less than one hour nor more than ten hours. Testimony, Howard, p. 224.

The attempt to avoid anticipation by the German patent (Lechler) is built around this technical meaning of the word "set" and derives from the use in that patent of the German words "abbinden" ("abgebunden") and "erhartung." The first word appears on page 1, line 18, and the second word appears in the title and on page 1, lines 3, 41, 63, and on page 2, lines 10 and 13. The German handbook on concrete, above cited, and one of the technical dictionaries (Technischer Wortschatz, by Von Dyck), seem to acknowledge the existence of the two chemical processes in the formation of concrete and to find them phonetically differentiated by the words "abbinden" and "erhartung." We were furnished, however, with two dictionaries (Hoyer-Kreuter Technological Dictionary and Illustrated Technical Dictionary by Schlomann) in which "erhartung" is also used to indicate setting.

We do not believe that either patent requires us to resort to such niceties. The German patent (Lechler) states the problem of curing concrete and the principal difficulty of its solution in language very similar to that of Hayden. In two places Lechler refers to the inclosing or coating of the concrete while still fresh or yet fresh (page 1, lines 9 and 30, 31). He further points out that this is contrary to the previous practice of allowing the concrete to dry out. That part of the patent in which the word "abbinden" is used bears out, rather than refutes, this interpretation of anticipation. It will be borne in mind that the Lechler patent is not concerned with flat and adherent concrete but rather with upright and independent concrete—concededly an analogous art. For that reason molds or forms are necessarily part of the art and the patentee is compelled to prescribe the dipping in the coating material after the articles have achieved a certain rigidity. Otherwise there is nothing to dip as obviously liquid cannot be dipped in liquid. It is in that sense we think Lechler uses the word "set," and to give it the technical meaning argued for by the plaintiff would be to entirely ignore the rest of the sentence which reads, "and can be removed from the mold." Both patents, to our way of thinking, evince an intention to apply the coating material of bituminous emulsion at an earlier stage in the life of the concrete than had been the previous practice. Neither patent fixes with any exactness at just what moment that earlier stage has arrived.

We conclude that the world already had the conception of coating as soon as practical after pouring rather than at some later stage of the hardening process. In other words, we think that any fair emphasis on the teaching of the German patent must stress the adjective "fresh."

The bill will be dismissed.