BARBER ASPHALT CORPORATION et al. v. LA FERA GRECCO CONTRACTING CO. et al. (STULZ–SICKLES CO., Intervenor).

No. 7397.

Circuit Court of Appeals, Third Circuit.

Sept. 20, 1940.

On Rehearing Dec. 4, 1940.

As Amended Dec. 5, 1940.

Samuel Ostrolenk, of New York City (S. Michael Pineles, Sidney G. Faber, and Orville N. Green, all of New York City, of counsel), for appellants.

Busser & Harding, of Philadelphia, Pa. (Hayward H. Coburn and George J. Harding, both of Philadelphia, Pa., of counsel), for appellees.

Before BIGGS, JONES, and GOODRICH, Circuit Judges.

BIGGS, Circuit Judge.

Barber Asphalt Corporation, formally joined as a plaintiff, successor to Barber Asphalt Company and the owner of Hayden United States Patent No. 1,684,671, and the real party in interest, the plaintiff Johnson-March Corporation, as exclusive licensee under the Hayden patent, brought suit against the defendant La Fera Grecco Contracting Company alleging direct infringement of claim 4 of the patent. Stulz-Sickles Company intervened in the suit and alleged in a counterclaim that the plaintiffs were violating the anti-trust laws of the United States in that the plaintiffs were attempting illegally to extend the monopoly of the patent. Stulz-Sickles Company was required to intervene by its contract with La Fera Grecco, which compelled it to defend the latter company and save it harmless in any infringement suit. The defendant Thompson Materials Corporation was brought into the proceedings by Stulz-Sickles as a defendant to the counterclaim. We shall deal with the relations of these companies to one another in more detail at a later point in this opinion.

The Hayden patent, issued September 18, 1928 upon an application filed October 12, 1925, is for a method of preventing evaporation from concrete during curing. As is generally known concrete is composed of a mixture of cement, sand, crushed rock and water. To secure proper hydration of the cement in the mixture it is necessary that evaporation of the water be prevented until the chemical combination of the water and the cement is completed. This process of hydration is known as curing, and takes approximately thirty days. If the water be lost before the chemical reaction is completed, the concrete will crumble and deteriorate. The Hayden patent discloses a method to prevent the water from leaving the mixture before hydration is completed.

In the specifications Hayden refers to various known methods of protecting concrete from water evaporation during the curing period especially applicable to roads or similar constructions where the concrete is largely exposed to air. He speaks of the application of wet burlap to the exposed surface of the concrete "immediately after finishing" replaced with wet earth or straw, of the spreading of tar on the surface of the concrete "* * * after the concrete has set, or attained a rigidity such as to enable workmen to walk on it without marring the surface." He refers also to dikes built about the surface of the concrete to maintain water upon its surface until hydration is completed. He goes on to say that these methods are open to numerous objections in that they involve substantial expense "* * * and are ineffective in preventing the evaporation of water from the concrete during the critical period before the concrete has set, or the protection of the concrete is not attempted until substantially after the critical period has passed, as is evidenced, for example, by the occurrence of hair cracking * * *." Hayden then sets forth the gist of his disclosure as follows: "I have discovered that if cement or cement concrete be treated, after it is finished, i. e., smoothed off, or broomed if so finished, and before it has set, i. e., before it will support a substantial weight, such as that of a man walking on it, without marring, by the formation on the exposed surface thereof a water impervious

film, which preferably will adhere to the concrete, and the concrete be then permitted to set and cure without disturbance, the concrete will cure without hair cracking and when cured will be found to have greatly increased strength, durability and resistance to weathering as compared to concrete treated by the methods heretofore known." Hayden states that he applies his water impervious film to the exposed surface of the cement or cement concrete to be cured before it has set. He defines "set" as "* * * a condition of firmness or rigidity such that it will support a substantial weight without marring of the surface, as for example, the weight of a man walking on it." The patent specifications reiterate the preferred time for applying the film, as follows, "* * * the film is applied as soon as practical after the cement or concrete is laid and finished; however, it must be applied before the concrete has set, as indicated above, if the benefits of my invention are to be obtained."

Hayden describes as materials suitable to form the impervious film ordinary liquid asphalt paint, native asphalt when dissolved in a volatile petroleum solvent, and ordinary linseed oil paint. He also states that he sprays the emulsion or bituminous matter or paint upon the "wet unset" concrete.

Only the fourth claim of the patent is in litigation in the suit at bar. It claims: "The method of preventing evaporation of water from the surface of a freshly laid concrete roadway which includes spraying upon such surface, before the concrete has set, a bituminous emulsion for the formation of an adherent water impervious bituminous film thereon."

An examination of Hayden's original patent application fails to disclose the conception now so heavily emphasized by the plaintiffs to sustain the patent's validity, namely the application of the water-resistant film or bituminous emulsion before the concrete has set, or has attained a rigidity sufficient to support the weight of a man without marring its surface. That this is the case is glaringly apparent when one examines the amendments made to Hayden's application in 1928.[1] Indeed, there is

[1] The words "before set" were added to the application the first time by the amendment of April 28, 1928. The phrase in the original application, quoted immediately hereafter, that the bituminous paint or emulsion applied "four hours after pouring the concrete" would form a satisfactory protective film, was stricken out by the amendment of July 23, 1928. The words "as soon as

no reference whatsoever to the application of the water impervious film or bituminous emulsion prior to set except in the 1928 amendments. This is the very crux of the patent phase of the case at bar and presents the only valid distinction which might serve to distinguish Hayden's disclosure over the prior art as represented by Lechler's German Patent No. 337,134 of May, 1921. But an examination of the article on the prevention of shrinkage cracks in concrete roads by Dr. Kleinlogel, published in "Die Betonstrasse" of November 1, 1927, makes it very clear that the art had been enlightened, if that enlightenment was needed as to the necessity of painting the emulsion upon the concrete immediately after the completion of the laying of the concrete if hair cracking in the surface was to be avoided, prior to the time when the Hayden amendments were received in the Patent Office. It follows therefore that Hayden and his assignees are caught on the horns of a dilemma, for if the 1928 amendments be material the application and hence the patent are void. Chicago & N. W. Railway Company v. Sayles, 97 U.S. 554, 563, 24 L.Ed. 1054; Steward v. American Lava Company, 215 U.S. 161, 168, 30 S.Ct. 46, 54 L.Ed. 139; Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34; Insulite Co. v. Reserve Supply Co., 8 Cir., 60 F.2d 433, 435. If upon the other hand these amendments made in 1928 are not material Hayden's disclosures are anticipated completely by Lechler's patent.

Lechler states that it is well known that cement concrete attains strength more quickly if it is kept moist and that this result could be obtained "* * * by toilsome sprinkling, by covering with moist bags," etc. Lechler goes on to say that his process consists of enclosing "* * * the still-fresh concrete on all sides by water-resistant coating materials" such as asphalt and tar lacquers consisting of bituminous substances, and that this will prevent "the evaporation of the mixing water of the concrete." In this way, he says, the water necessary for attaining great strength remains in the concrete and need not be replaced by artificial moistening. In respect to concrete structures, such as retaining walls and foundations, Lechler states that the tamped or dressed structures are to be coated "while they are yet fresh, as well as the formed surfaces [which] are to be coated forthwith after removal of the forms." Lechler's patent contains one claim. It is for a "Process for the accelerated attaining of final strength of concrete and for avoiding the formation of shrinkage cracks, characterized by the enclosure, on all sides, of the fresh concrete in rapidly drying coating materials which hinder, during the hardening period, the evaporation of the mixing water of the concrete and, by keeping the concrete moist, accelerate its uniform hardening."

Wetted burlap or wetted straw was the method ordinarily employed throughout the art prior to the use of water-resistant coating to prevent dehydration. When the operation and effect of the chemical combination between water and cement was understood, ordinary common sense and ordinary mechanical ingenuity would dictate the application of the means employed to prevent dehydration, whether wet burlap or water-resistant emulsion, as soon as possible.[2] For this reason as well as those already stated, we can perceive no invention in the Hayden patent. In the contributory infringement suit of Barber Asphalt Company v. Stulz-Sickles Company, 3 Cir., 89 F.2d 960, reversing an earlier decision of the District Court of the United States for the District of New Jersey, reported in 14 F.Supp. 212, this court held the Hayden patent valid. Being convinced that this decision was erroneous, we now expressly overrule it. The decision of the District Court appealed from in the case at bar, reported in 30 F.Supp. 497, which we now reverse, was based by the learned District Judge squarely upon our earlier erroneous decision and the principle of Lekto-

practical" were inserted in lieu thereof along with the phrase "but in any event before the concrete has set."

[2] Burlap ordinarily is placed upon the concrete as soon as possible after the brooming machine has passed, a period very much less than the four hours referred to in Hayden's original application. We think it is plain that in his original application Hayden was very far from desiring to emphasize the application of the emulsion prior to set. We are of the opinion that what he desired to make plain in his original application was that his emulsion would prevent dehydration if applied four hours after the concrete had been poured or finished. The chemical reaction of cement and water is far advanced at the end of even thirty minutes.

phone Corporation v. Miller Bros. Co., D.C., 37 F.2d 580.[3]

In respect to the question raised by the counterclaim, viz., whether the plaintiffs have illegally extended the monopoly of the Hayden patent, we state as follows. This court in its earlier decision held the principle enunciated by the Supreme Court in Carbice Corporation v. American Patents Development Corporation, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819, to be inapplicable. Leitch Manufacturing Company, one of the defendants in that suit, petitioned for certiorari, contending that Barber Company's suit could not be maintained, even if the patent were valid, because it would serve to create a limited monopoly in respect to an unpatented staple article of commerce bituminous emulsion which had been upon the market for many years. The Supreme Court granted certiorari and in Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371, reversed the decree of this court, holding that the principle of the Carbice Corporation case was precisely applicable. Prior to this decision Barber Asphalt Company, which, as we have already indicated was the predecessor to the plaintiff Barber Asphalt Corporation, was the owner of the Hayden patent and issued licenses thereunder. After the decision of the Supreme Court, the successor corporation, the plaintiff Barber Asphalt Corporation, adopted the following method of doing business. It gave an exclusive license to the plaintiff Johnson-March Corporation to practice the method of the patent and to issue sub-licenses to others upon payment "* * * of a monetary license fee or royalty to it [Johnson-March] on account of the use of said invention." Barber Asphalt Corporation by this exclusive license divested itself of all rights in the Hayden patent except bare legal title. Johnson-March agreed to pay Barber Asphalt Corporation a royalty of 2 cents per gallon for all bituminous emulsion bought by it from Barber and used pursuant to the patented process. Johnson-March Corporation then entered into a contract of agency with Thompson Materials Corporation. By this agreement Johnson-March granted to Thompson the exclusive right to sell "'Hunt Process'", "'Curcrete'" and "'Ritecure'", all bituminous emulsions, to be used on highways, pavements and structures according to the method of the Hayden patent to licensees of Johnson-March within specified territory.[4] This license by its terms remained in full force until December 31, 1938 with renewal at the option of Thompson for one year provided Thompson demonstrated that it had sold fifty per centum of all available curing contracts let by the state highway departments of the respective states in the preceding year. Thompson in turn entered into sales agreements with contractors whereby it agreed to furnish and the contractors agreed to accept and pay for Hunt Process and Ritecure in sufficient quantities to cure specified yardages at a stated price per gallon, the sales agreements specifically stating; however, that the price per gallon fixed included all royalties due on account of the curing of concrete under the license of the Hayden patent, Thompson agreeing to remit the royalties to Johnson-March Corporation and to save the contractors harmless on account of any claim of infringement. The sales agreements recite that the contractors are licensed by the Johnson-March Corporation under the Hayden patent in consideration of the payment to Johnson-March of a royalty of 1 cent per square yard of concrete covered.

The record shows that Johnson-March Corporation bought all of its bituminous emulsions from Barber Asphalt Corporation and that Thompson bought all of its emulsions from Johnson-March. The middleman channel through which Barber Asphalt Corporation's emulsions went from Barber Asphalt Corporation to contractors in the specified territory is clear. Barber Asphalt, Johnson-March and Thompson are competitors with Stulz-Sickles in the sale of bituminous emulsion. None of them engage in road building. The situation presented by the facts as just stated are very

---

[3] In the Lektophone case Judge Morris of the District Court of the United States for the District of Delaware, stated, 37 F.2d at page 581: "The orderly administration of justice requires that matters decided by the Circuit Court of Appeals of any circuit have a binding effect upon all the District Courts in that circuit, notwithstanding contrary decisions in other circuits. Edison Electric Light Co. v. Bloomingdale (C.C.) 65 F. 212. Such matters include the validity and construction of letters patent, where the evidence pertinent to such issues are the same."

[4] The states of New York, New Jersey, Connecticut, Massachusetts, Maine, Vermont, New Hampshire, and Rhode Island.

similar to those which were before the Supreme Court in the case of Leitch Mfg. Co. v. Barber Company, but, the plaintiffs point out that there is an alternative license made available by Johnson-March by another and a different type of contract than those referred to,[5] to any contractor who desires to use the Hayden process without purchasing Barber Asphalt Corporation's emulsions; that Johnson-March grants nonexclusive licenses to use the Hayden process for a royalty or license fee at the rate of 1 cent per square yard of concrete cured, and that at least four such licenses, bringing Johnson-March substantial sums of money between October 5, 1938 and February 9, 1939, were issued. Pointing to the opportunity to receive licenses to employ the Hayden process without reference to the source of the bituminous material, the plaintiffs strongly urge that by this they have cured the vice prohibited by the ruling of the Supreme Court in the Leitch Manufacturing Company case. The defendants contend to the contrary.

■■ An examination of the record will disclose immediately that the amount of bituminous emulsions used for curing varies widely with certain indefinite factors, such as the skill of the operator, the intent to spread the emulsion thickly or thinly, the temperature and the humidity. The record abundantly demonstrates that while some estimates provide for the spread of emulsion at the rate of one gallon for every five to eight yards, the spread may be from eight to ten yards and upon occasion may reach twenty yards per gallon. If a contractor has purchased Barber Corporation emulsions vended through the channel of Johnson-March and Thompson, any royalty that he pays for the use of the Hayden process is included in the price per gallon. If, upon the other hand, he purchases emulsions elsewhere and uses the Hayden process the royalty which he must pay is based upon the number of square yards covered in the process and the contractor is faced with an elusive and indefinite factor in estimating his costs when he bids upon a job. An example will illustrate the difficulty which the contractor faces. We will assume that the intervenor, Stulz-Sickles Company, sells bituminous emulsions to a contractor who causes a gallon of it to be sprayed over five square yards of concrete. The record shows that Stulz-Sickles sold

such emulsions at a price of 15 cents per gallon. It follows that the cost to the contractor to buy the gallon of emulsion and to spray it on the concrete is 20 cents. If the gallon of emulsion is sprayed over fifteen yards of concrete, the cost to the contractor would be 30 cents. If that contractor buys Barber Asphalt Corporation's emulsions sold through the Johnson-March Thompson channel for the price of 24 cents a gallon with license included, he may spread the emulsion as widely as he can without additional cost; in fact, the less emulsion he uses, the lower the cost to him. On the other hand, if the contractor did not buy Johnson-March Thompson emulsions, the more emulsion which he uses per square yard, the smaller the license fee which he must pay. If the spread is wide, the cost of the license to the contractor is proportionately high. The contractor who does not purchase his emulsions through the Johnson-March Thompson middleman channel is faced with the economic anomaly that upon spreading his emulsions sparingly his cost is increased; thickly, the cost is reduced. The plaintiffs have made the economic stream run up-hill.

In connection with this situation the learned District Judge stated [30 F.Supp. 497, 505], "The court concedes that the transition of royalty calculation from a per gallon basis to a square yard basis is mysterious and unexplained. But suspicion is not sufficient to establish the monopolistic practice claimed by the counterclaimants." We do not regard the circumstances with mere suspicion. We regard them with the certainty that the so-called alternate license offered by Johnson-March is and was an illegal device entered into for the purpose of avoiding the prohibition enunciated by the Supreme Court in Leitch Mfg. Co. v. Barber Company. This is made all the more palpable by an examination of the first paragraph of the sales agreement offered by Thompson, in which it is recited that the contractor is licensed by Johnson-March under the Hayden patent in consideration of the payment to Johnson-March of a royalty of 1 cent per yard on the basis of engineer's estimate. These words are included in that very sales agreement wherein it is expressly provided that the price fixed per gallon shall include "* * * all royalty which shall be due on account of the curing of the said concrete under the

---

[5] The pertinent portions of all the contracts are set out in haec verba in the opinion of the court below, pages 502–504 of 30 F.Supp.

said license * * *", Thompson agreeing to save the contractor harmless from any claim of Johnson-March made on account of royalty. It is obvious that Thompson can no more transmute royalty per gallon into royalty per square yard, or royalty per square yard into royalty per gallon, than can the plaintiffs' competitors or any one else. He who buys emulsion without buying a license to spread included in that purchase is therefore at a tremendous economic disadvantage. The principle enunciated by the Supreme Court in Carbice Corp. v. American Patents Development Corp., supra, is exceedingly explicit. It holds that the owner of a patent for process may not secure a partial monopoly on the unpatented material employed in it. This is precisely the effect of the agreements and licensing plans of the plaintiffs. Accordingly the court below erred in holding that the course pursued by the plaintiffs did not create an unlawful monopoly in the sale of unpatented staple material, viz., bituminous emulsions.

We have gone into the nature of the licensing agreements because they are put squarely in issue by the counterclaim and because they are sought to be maintained upon a decision of this court holding the Hayden patent valid and infringed. Whether the counterclaim be deemed to be compulsory under Rule 13(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, applied in the light of the decision of the Supreme Court in Moore v. New York Cotton Exchange, 270 U.S. 593, 609, 46 S.Ct. 367, 70 L.Ed. 750, 45 A.L.R. 1370, construing old Equity Rule 30, 28 U.S.C.A. following section 723, a rule less liberal on the line of "logical relationship" of claim to counterclaim than Rule 13(a), or whether the counterclaim be held to be a permissive one under Rule 13(b), is of small importance, for the subject matter of the counterclaim is one with which the anti-trust laws of the United States are concerned. Jurisdiction of that subject matter is vested in courts of the United States and the court below had jurisdiction of all the parties. The counterclaim sets up a cause of action independent of the validity or invalidity of the Hayden patent.

Accordingly, the judgment of the court below is reversed and the cause is remanded with directions to dismiss the complaint for want of equity, to reinstate the counterclaim and to enter judgment granting relief thereunder.

## On Rehearing.

Upon rehearing a majority of the court has reached the same conclusion as that expressed in its original opinion filed September 20, 1940. Assuming, as contended by Barber Asphalt Corporation and the Johnson-March Corporation, that the bituminous emulsion sold to contractors by the Barber Corporation through the channel of Johnson-March or Thompson is sold at prices (royalty included) which do not differ substantially from the costs incurred by contractors who purchase bituminous emulsion elsewhere and pay royalty by the gallon (an assumption which we think is controverted by the record), none the less Barber and Johnson-March have employed the patent as a means of obtaining a limited monopoly in the sale of a staple article of commerce, viz., bituminous emulsion. We conclude that this is so because of the uncertainty of cost imposed upon a contractor who buys bituminous emulsion from other than Johnson-March or Thompson and spreads it in accordance with the teaching of the patent. The prices of Johnson-March or Thompson, with the royalty included, save the purchaser from the uncertainty of the charge for royalties computed upon the number of gallons of material used.

Economy of operation requires that contractors who purchase emulsion from other than Johnson-March or Thompson spread a gallon of the material over no less than a certain yardage, being careful to spread it over no more than that yardage in order that the cost of the royalty may not be unduly increased. To pursue such a restricted course obviously presents great practical difficulties. On the other hand, those who purchase from Johnson-March and Thompson may spread emulsion as thinly as practice or specifications will allow, thus reducing the cost of material per yard spread without regard for the cost of any royalty based on gallonage.

In substance therefore the alternative method of licensing adopted by Johnson-March has the effect of driving the contractor back into the arms of Barber's distributors, compelling him to embrace the monopoly and procure a license under the patent in order that he may make use of an unpatented staple of commerce. The result is to afford Barber the advantage of the illegal practices prohibited by the decision of the Supreme Court in Leitch

Manufacturing Co. v. Barber Co., 302 U. S. 458, 463, 58 S.Ct. 288, 82 L.Ed. 371. See, also, Carbice Corp. v. American Patents Developments Corp., 283 U.S. 27, 34, 51 S.Ct. 334, 75 L.Ed. 819.

We will correct an error appearing in the second paragraph of page nine of the printed opinion [116 F.2d 215] filed September 20, 1940 by striking from the ninth line [thirty-eighth line] thereof the word "twenty" and substituting in lieu thereof the words "fifteen to eighteen" in order to make that opinion conform with the record before us.

We think that we need add nothing to the conclusion which we have heretofore expressed in regard to the invalidity of the Hayden patent.

Accordingly, the judgment of the court below is reversed and the cause is remanded with directions to dismiss the complaint for want of equity, to reinstate the counterclaim and to enter judgment granting relief thereunder.

GOODRICH, Circuit Judge (dissenting in part).

The problem in connection with this case which troubles me is that which concerns the alleged illegality of the arrangements by which Thompson, under the arrangements with Johnson-March Corporation, sells bituminous emulsion at a price which includes, on a per gallon basis, the royalty fee. The purchaser who buys at the end of the Barber-Johnson-March-Thompson route pays the price of x cents per gallon for the emulsion, plus 2¢ royalty fee. The purchaser who buys elsewhere pays x cents per gallon for emulsion and must pay a royalty fee of 1¢ per square yard for surface covered by this gallon of emulsion. The question is whether this constitutes an illegal type of arrangement so as to bring this state of facts within the rule of the Carbice Corporation case [1] as applied in the Leitch Manufacturing Co. case.[2]

I agree with my colleagues that a contractor is "faced with an elusive and indefinite factor in estimating his costs when he bids upon a job". But these indefinite factors mentioned, the skill of the operator, temperature, humidity, etc., are equally present whether a contractor pays royalty in terms of a price per gallon or in terms of a price per square yard of spread. This point seems to me to be clear.

Now, does the method of paying royalty on the per gallon basis give the one who purchases that way an advantage over another who purchases on the per yard royalty basis? If so, it may well be that we have here forbidden practice. My difficulty comes in seeing how any advantage arises. Suppose a road contractor limits the spread of a gallon of emulsion to eight square yards as we are told the New Jersey rules require. On that basis the royalty price figured by the "spread" of the emulsion would be 8¢ per gallon. A purchaser certainly can know with fair certainty whether it is more advantageous to buy from a Thompson competitor and pay the royalty himself or whether to buy from Thompson and have the royalty included in the price per gallon. It appears that petroleum emulsion is an article easily bought from several sources in the open market. The determination of where to purchase seems to me to be wholly a matter of intelligent guessing plus arithmetic on the part of the purchaser. The element of uncertainty in the guessing with its consequent effect upon expenditure for petroleum emulsion seems to me to be a problem equally applicable to purchasers from Thompson as from any other seller of petroleum emulsion.

While I agree with the majority opinion upon the question of the invalidity of the patent I am unable to see, with regard to the counterclaim, how the marketing practice involves a transgression of the rule of law announced in the Carbice case.

[1] 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819.

[2] 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371.