### NATIONAL FOAM SYSTEM, Inc. v. URQUHART et al.

Civ. No. 9923.

United States District Court
E. D. Pennsylvania.

Jan. 18, 1952.

John Ross, Laurence H. Eldredge, and Charles C. Norris, Jr. (of Norris, Lex, Hart & Eldredge), all of Philadelphia, Pa., for plaintiff.

J. Matthews Neale and Strauch, Nolan & Diggins, all of Washington, D. C., for defendant.

KIRKPATRICK, Chief Judge.

This is a civil action for a declaratory judgment. The defendants were owners of two patents covering apparatus and process for generating and throwing fire extin- guishing foam. On April 15, 1941, the plaintiff, which sold both the patented ap- paratus and unpatented stabilizer used in making the foam, made an agreement with the defendants providing for payments by it of certain license fees in consideration of the defendants' agreement, among other things, to give free licenses to practice the patented process to purchasers of apparatus and supplies from the plaintiff. On May 31, 1949, the Court of Appeals, Pyrene Mfg. Co. v. Urquhart, 175 F.2d 408, for the Third Circuit, affirming a judgment of this Court, held the process claims invalid for want of invention. The plaintiff now asks to be relieved of all liability under the con- tract as of the date of the judgment of the Court of Appeals.

Two major questions are involved (1) Has the plaintiff's liability to pay royalty been terminated by a failure of considera- tion resulting from the judgment of invalid- ity of the patent? (2) Is the contract un- enforceable because the defendants used it as a means of enlarging the patent monopo- ly so as to restrain free competition in the unpatented stabilizer?

(1)

If it were necessary to the decision, I would have no difficulty in holding that the 1941 agreement is a license and that there has been an eviction. Whatever the exact form of the grant, the plaintiff obtained the right to use the patented process for pur- poses of demonstration and to manufacture and sell the patented apparatus.[1] In addi- tion, it obtained the right, without further action by the defendants, to invest any of its customers with a royalty-free license to practice the process. For this it agreed to pay a percentage of the price of the sta- bilizer which it sold, described in the agree- ment as "license fees". Looking at sub- stance rather than form, the agreement cannot be considered as anything but a non- exclusive license.

"Eviction" in the patent law is a not very clearly defined concept, and attempts by the courts to define it and apply it as a techni- cal doctrine have resulted in considerable uncertainty. Recognizing the conflict, I

---

[1]. The apparatus claims were also held invalid by the Court of Appeals.

am satisfied with the rationale of the opinion of the Circuit Court of Appeals for the Sixth Circuit in Drackett Chemical Co. v. Chamberlain Co., 63 F.2d 853, and would, if necessary, accept that case as stating the law. The case is in point and holds that an eviction occurs where a patent under which a license has been granted has been declared invalid, whether the license is an exclusive or a nonexclusive one. However, it seems to me that, in this case, broad principles of law make it unnecessary to resort to technical rules or finely drawn distinctions.

As a practical business matter, what this plaintiff agreed to pay for has become to all intents and purposes worthless to it. Any substantial value which the patent had is lost, leaving only the remote and highly speculative possibility that some other Court of Appeals may hold the patent valid and that the Supreme Court will then review the case and come to the same conclusion. It would be hard indeed to convince any business man that such a possibility is a thing worth paying money for. Moreover, if the plaintiff is compelled to pay royalties during the life of the patent, not only will it be receiving no perceptible consideration but it will be placed in a position which will make it impossible to meet its competitors on even terms—a disadvantage which could conceivably force it altogether out of the market.

In this case both parties believed the patent valid. As the law now stands, that belief was a mutual mistake, and we are concerned with the law as it now stands. This Court is bound by the judgment of invalidity of the Court of Appeals and cannot refuse to accept that judgment for the purpose of this decision on the basis of the possibilities which the patent law offers of some future contrary decision.

▪▪▪ Of course, a license under a patent is in some respects sui generis, but it can be more closely assimilated to a sale calling for delivery and payment in installments than to anything else. In such a contract when deliveries cease irrevocably, there is a total failure of consideration as to future payments and the buyer is ordinarily released. The royalties under a

patent license purchase not only the right to use the patent but also the practical assurance that the licensee can do so without any competition if the license is an exclusive one, and, if it is nonexclusive and contains a covenant against more favorable terms to other licensees (as this one does), with at least the assurance that he will be able to meet competition on equal terms. As long as a patent has not been invalidated by a court decree, the licensee gets what he bargained for, regardless of any infirmities the patent may have. After that time, the consideration, to all intents and purposes, has failed. "A total failure to receive the agreed exchange for the performance of a promisor's contractual duty discharges that duty", Restatement Contracts, Section 399.

## (2)

In the Pyrene case (Pyrene Mfg. Co. v. Urquhart), D.C., 69 F.Supp. 555, this Court held that the license agreement was invalid because of misuse of the patent in connection with the sale of unpatented stabilizer. The Court of Appeals, in its final opinion, refrained from passing upon the question. However, I have not found anything in this record to change my view.

I agree that the portion of the Urquhart plan represented by the agreement of 1941, standing alone, would be held to be legal against a charge of patent misuse. The vice of the plan lay in the announced policy of the defendants to discriminate between users of the process who buy their stabilizer from the plaintiff and users who buy it elsewhere.

The testimony of Mr. G. G. Urquhart in the Pyrene case was positive and unequivocal to the effect that the owners of the patent had no intention of granting the generality of users licenses for the same royalties as those specified in their agreement with the plaintiff, and Mr. R. Morris Urquhart, in a deposition taken in the same case, said that he did not think he would, but "I would be advised by counsel what to do." In effect, the defendants now say that the Court misinterpreted this testimony or, if not, that they did not mean what they appear to have said, and they point to a new form of license for general con-

sumers, which they had prepared and printed in September 1947 but which has not, as a matter of fact, been actually used at any time. Assuming, however, that this form of license represents the policy which the defendants propose to follow in granting consumer licenses, their position is not bettered. Instead of 15% of the net selling price (the license fee which the plaintiff's customers would pay) the general consumer license fees are fixed at 10 cents per pound, which amounts to 94 cents per gallon. The use of one method of computing royalties to favored customers and a different one to others is exactly what was condemned by the Circuit Court of Appeals in Barber Asphalt Corp. v. La Fera Grecco Contracting Co., 3 Cir., 116 F.2d 211. In that case the point was that the license to consumers in general was on a basis which would make it almost impossible to tell how much any of them would have to pay. The difficulty in this case is not that the consumers cannot ascertain what they would have to pay but that they can be pretty sure that they would have to pay more for their licenses than the plaintiff's customers. Unless the market price of stabilizer (which is a more or less standard product) goes above $6.30 a gallon, the general consumers' licenses at 94 cents a gallon are bound to cost more than the plaintiff's customers' licenses at 15% of the selling price; and there is no evidence before the Court that the price is or has been more than $4.50. The cost of the license is, of course, reflected in the cost to the consumer of the commodity and the result is that as long as the price of stabilizer is less than $6.30, the plaintiff may safely tack the 15% royalty to the market price and still undersell its competitors.

█ The defendants urge that the higher license fee charged consumers is justified because they (the defendants) would have to provide services and know-how in addition to the licenses and, therefore, would be put to this additional expense when dealing directly with the consumer. The argument fails for two reasons: (1) The proposed license form for direct consumers makes it abundantly clear that the defendants are not bound in any way to provide any services or know-how. In fact, a

customer with an installation already set up would be unlikely to need any services or know-how if he intended merely to replenish his supply of stabilizer. (2) Assuming the defendants are put to this additional expense, the effect of the system is still to make it more expensive for the consumer to purchase his unpatented stabilizer on the open market than for him to purchase it from the defendants' manufacturing licensees.

The stipulated facts may be taken as the Court's findings.

An order for judgment may be submitted.